**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| HAROLD W. NIX AND CAROL A. NIX, | § | |
| CHARLES C. AND MARY L. | § | |
| PATTERSON, NELSON J. ROACH, | § | CASE NO.  2:17-CV-00434-JRG (LEAD) |
| | § | |
| | § | CASE NO. 2:17-CV-00435 |
| Plaintiffs, | § | |
| | § | CASE NO. 2:17-CV-00436 |
| v. | § | |
| | § | [FILED UNDER SEAL] |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a partner-level refund suit filed under 26 U.S.C. § 6230(c)(3) after three partners, Harold Nix ("Nix"), Charles Patterson ("Patterson"), and Nelson Roach ("Roach") (collectively, "Taxpayers"), paid the taxes, penalties, and interest assessed against them as a result of two prior partnership-level suits under 26 U.S.C. § 6226. The Court held a bench trial in this case during April 18 and 19, 2018. (Dkt. Nos. 117–118.)

Based on the following findings of fact and conclusions of law, the Court holds that (1) the Taxpayers are not liable for the accuracy-related penalties because they acted reasonably and in good faith; (2) the Taxpayers are entitled to interest suspension for the time periods set forth herein because they acted reasonably and in good faith; (3) the Taxpayers are not entitled to deduct the fees that they paid directly to Diversified Group, Inc. and Pollans & Cohen; (4) the assessments for Mr. Patterson in 2001 and 2002 were timely and any subsequent adjustment to his account was to correct a clerical mistake by the IRS; and (5) Mr. Roach is not entitled to claim losses for the foreign currency that he disposed of in 2001 and 2002.

# I.     FINDINGS OF FACT ("FF")

## A.     Evidence

**[FF1]**     The Parties stipulated to the admission of exhibits and designated testimony. (*See generally* Dkt. No. 119.) Accordingly, the Court treats any exhibits that were stipulated to as admissible evidence properly to be considered.

**[FF2]**     The Parties also made additional stipulations in lieu of introducing prior testimony of certain individuals including R.J. Ruble, James Haber, Mox Tan, Dr. DeRosa, Dr. James Read, and Dr. Andrew Carron. (*See generally* Dkt. No. 119.) These stipulations, together with the exhibits attached thereto, are incorporated herein and adopted by this reference.

## B.     The Parties

**[FF3]**     Plaintiff Harold W. Nix ("Nix") is an attorney who has been practicing law for fifty-two years. (Tr. II at 47:23–24.)

**[FF4]**     Plaintiff Charles C. Patterson ("Patterson") is an attorney who has been practicing law since 1976. (Tr. I at 44:17–45:10.) Mr. Patterson worked at a variety of law firms before he began working with Mr. Nix in 1986. (*Id.*)

**[FF5]**     Plaintiff Nelson J. Roach ("Roach") is an attorney who has been practicing since 1984. (Tr. I at 168:2–6.) Mr. Roach began working with Mr. Nix and Mr. Patterson in 1987. (Tr. I at 169:10–11.)

## C.     Procedural History

**[FF6]**     In 2000, Mr. Patterson was a partner in Klamath Strategic Investment Fund, LLC ("Klamath"), and Mr. Nix was a partner in Kinabalu Investment Fund, LLC ("Kinabalu") (collectively, the "Klamath Transactions" or "Klamath Investments"), the tax reporting of both of which was challenged by the Internal Revenue Service (the "IRS"). At the partnership-level, both

Klamath and Kinabalu challenged the IRS adjustments in the Eastern District of Texas and were consolidated for trial into the lead *Klamath* case[1].

**[FF7]**    The mandate affirming the district court's decision was issued on April 24, 2014. (Dkt. No. 281, 5:04-cv-278.)

**[FF8]**    In 2001, Mr. Patterson, Mr. Nix, and Mr. Roach (collectively, the "Taxpayers" or "Partners") were partners in a different partnership, NPR Investments, LLC ("NPR"), the tax reporting of which was also challenged by the IRS. At the partnership-level, NPR also challenged the IRS adjustments in the Eastern District of Texas.[2]

**[FF9]**    In its Final Amended Judgment, this Court found "penalties under 26 U.S.C. § 6662(d), (e) and (h) apply provisionally to all underpayments of tax by NPR's partners that are related to adjustments made in this partnership-level proceeding, although only one of those penalties may actually be imposed because the penalties are not cumulative." (Dkt. No. 173 at 2, 5:05-cv-219 (Amended Final Judgment).)

**[FF10]**    The Amended Final Judgment was entered on August 1, 2014. (*Id.*)

**[FF11]**    As part of the NPR Partnership-Level Proceeding, "Plaintiff [NPR] conceded that NPR lacked a profit motive and that NPR's partners, Harold Nix, Charles Patterson, and Nelson Roach, are therefore not entitled to deduct any expenses or losses flowing from NPR or related to their participation in NPR." (Dkt. No. 173 at 2, 5:05-cv-219 (Amended Final

---

[1] *See Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885 (E.D. Tex. 2007)*, aff'd sub nom. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009); *Klamath Strategic Inv. Fund, LLC v. United States,* 99 A.F.T.R.2d 2007-2001, 2007 WL 1051766 (E.D. Tex. Apr. 3, 2007), *vacated sub nom. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009); *Klamath Strategic Inv. Fund, LLC v. United States*, 110 A.F.T.R.2d 2012-6021, 2012 WL 4889805, at *1 (E.D. Tex. Sept. 24, 2012), *aff'd sub nom. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 557 F. App'x 368 (5th Cir. 2014) (collectively, the "Klamath Partnership-Level Proceeding").

[2] *NPR Investments, LLC, ex rel. Roach v. United States*, 732 F. Supp. 2d 676 (E.D. Tex. 2010), *aff'd in part, vacated in part*, *rev'd in part sub nom. NPR Investments, L.L.C. ex rel. Roach v. United States*, 740 F.3d 998 (5th Cir. 2014) (collectively, the "NPR Partnership-Level Proceeding").

Judgment).); *see also NPR*, 740 F.3d at 1013 ("NPR and the Taxpayers have conceded that NPR lacked a profit motive and that this precludes the Taxpayers from deducting the losses.").

**[FF12]**    The Parties also stipulated to conclusive determinations in the prior partnership-level proceedings. (*See* Dkt. No. 40; Dkt. No. 102 at 13.) While parts of those stipulations are included herein, the stipulations in their entirety are incorporated herein and adopted by this reference.

### D.    **The Law Firm**

**[FF13]**    During the time period at issue, the Taxpayers practiced together in the law firm of Nix, Patterson, & Roach, L.L.P. (the "Law Firm"). (Dkt. No. 40-1 at 3–4, 24 ("Stipulated Facts from NPR Proceedings").)

**[FF14]**    The Law Firm's general practice focuses on plaintiff's work, including but not limited to products liability, Federal Employers Liability Act, and class action lawsuits. (Tr. I at 45: 14–20, 47: 2–10 (Patterson).)

**[FF15]**    The Law Firm has exposed the Taxpayers to a significant amount of risk because fees are contingent on success, and— given the resources of some of the defendants they litigate against (e.g., large tobacco companies)—success is never guaranteed. (Tr. I at 45: 21–23 ("Q: Was there a particular manner in which the law firm charged its clients for that type of work? A: Yes, we did it all on contingent fee."), 46:23–47:1 ("[T]here's ups and downs[.]"), 47:20–48:6, 48:18–22 ("Q: Did charging those fees on contingency fee – fee basis expose you and your firm to any risk? A: Yes. It was a very – very high risk. At the time we took on the case, the tobacco companies had tried over 700 cases to verdict and had never lost a case."), 49:18–50:3, 82:18–83:1 ("Q: Have you made other investments that had similar risk return reward profiles? A: Yes. Q: Can you describe some of those? A: My law practice is – is probably the best example of it. Q:

And why is that? A: Because we take on high risk cases, and we get high returns for them.").) By making their living in this environment, the Taxpayers have become accustomed to making risky business decisions. (*See id.*)

[**FF16**]     A key example of the sort of "high-risk, high-reward" cases that the Law Firm was involved in was the tobacco litigation, which began in 1996. (Tr. I at 47:14–49:2 (Mr. Patterson's testimony about the tobacco litigation).) The Law Firm had to invest $2 million of its own money up-front "to handle the litigation" even though at the time, the tobacco companies had never lost a case. (Tr. I at 47:20–48:6, 49:18–50:4 ("Q: Would you view there as having been a -- a high risk in connection with you participation in the tobacco fee litigation? A: Yes, sir. Q: Can you explain the risk? A: Again, we talked about the number of cases that tobacco had won at that time, and -- and you have to understand the playing field when we did this. They had a team of over 300 lawyers versus our team, which was approximately 30 or 35 lawyers. It was -- it was just massive in trying to undertake this deal in a short window of two years.").) When the litigation was complete, the five firms who had been hired by the Attorney General had invested $47 million in expenses. (Tr. I at 48:3–6.)

[**FF17**]     In 2001, each Taxpayer had an ownership interest in the Law Firm itself. (Tr. I at 51: 1–12 (Patterson); *Id.* at 172: 23–173:4, 186: 8–13 (Roach); Tr. II at 48:24–79:1 (Nix).) Thus, one of the principal investments for each of the Taxpayers at the relevant time period was the Law Firm, and more specifically, the cases being handled by the Law Firm.  (Tr. I at 51:1–12 (Patterson); *Id.* at 186:8–13, 209:11–13 (Roach); Tr. II at 48:24–49:1 (Nix).)

[**FF18**]     Based on the Taxpayers' line of work, the Court finds that the Taxpayers were comfortable with risk. By taking cases on contingency-fees, they had become seasoned risk-takers,

5

often using their own money to finance cases that were not guaranteed to be profitable. In essence, the Taxpayers were accustomed to making "high-risk, high-reward" investment decisions.

**[FF19]**    The Taxpayers had formed a trusting relationship with one another through their work together as partners in the Law Firm. They made decisions together, invested together in cases as owners of the Law Firm, and relied on one another.

**[FF20]**    It was not unreasonable for Mr. Roach or Mr. Nix to entrust Mr. Patterson with decisions related to investments or the Law Firm, and vice-versa. (Tr. I at 193: 15–21 ("[ROACH]: Well, Mr. Patterson and Mr. Nix and I have -- you know, at that time, we had been partners for 10 years, and not only law partners -- but we had been business partners to a certain extent. And oftentimes, we place trust in each other to -- to meet on our behalf and to report to us, and -- and I had confidence in Mr. Patterson, I trust him.").)

**[FF21]**    Despite the Taxpayers' backgrounds in law, they did not have special knowledge of tax law. The Law Firm does not represent clients in tax matters. (Tr. I at 50:6–7.) None of the Taxpayers has experience in tax law, has represented a client in tax matters, or has advised a client on tax matters. (Tr. I at 50:4–5, 8–15 (Patterson), 170:6–171:14 (Roach); Tr. II at 47:21–48:5 (Nix).)

### E.    Taxpayers' Assets and Experience with Risky Investments

#### 1.    Nix

**[FF22]**    Mr. Nix, in addition to his ownership interest in the Law Firm, chose to invest his money in real estate. (Tr. II at 48:24–49:1.) Mr. Nix also invested in oil and gas deals over the years. (Tr. II at 51:3–14.) Many of these ventures also had substantial risks, and Mr. Nix both made and lost significant sums of money on them. (Tr. II at 51:3–12.)

**[FF23]**    While Mr. Nix had experience with investments, he relied on tax advisors and financial assistants to assist with his investments and to manage his portfolio. (Tr. II at 48:19–23, 58:18–24.)

### 2.    **Patterson**

**[FF24]**    Mr. Patterson had his ownership interest in the Law Firm, owned stock in Century Bank, and owned "several pieces of land." (Tr. I at 51:1–12.)

**[FF25]**    While Mr. Patterson had experience with investments, he relied on tax advisors and financial assistants to assist with his investments and to manage his portfolio. For example, he used a financial advisor named Ben Floyd of Texarkana to handle his personal stocks and bonds. (Tr. I at 51: 7–8.)

### 3.    **Roach**

**[FF26]**    Mr. Roach, in addition to his ownership interest in the Law Firm, invested his money in stocks and bonds and real estate. (Tr. I at 172:22–173:2.)

**[FF27]**    Mr. Roach also had prior experience with options, having invested $10,000 in the mid-1980s. (Tr. I at 175:3–16.) That investment grew to approximately $100,000 in value, but he ultimately ended up losing his entire investment. (Tr. I at 177:6–22.) Mr. Roach learned several things about option trading from this experience, including that options were highly leveraged, involved a great deal of risk, and were time sensitive. (Tr. I at 175:14–16, 177:23–178:6.)

**[FF28]**    While Mr. Roach had experience with investments, he relied on tax advisors and financial assistants to assist with his investments and to manage his portfolio. These advisors included his former roommate, who was a stockbroker; Russ Winter; Bill Rice, III; and, on the advice of Mr. Patterson, Ben Floyd. (Tr. I at 174:15–179:1.)

**[FF29]**    There was no standard methodology that Mr. Roach used when picking a financial advisor. (Tr. I at 179:18–180:4.) Rather Mr. Roach relied on "word of mouth" and "recommendation and experience of other people" when picking financial advisors. (*Id.*)

**[FF30]**    Although Mr. Roach would usually personally meet his financial advisors, it was not unprecedented for Mr. Roach to not personally meet them. (Tr. I at 179:22–180:4 ("In the case of Mr. Birinyi, I never met Mr. Birinyi. And believe it or not, in the case of Mr. Floyd, even though he's managed my money or some of my money for, gosh, 17 plus years, I've actually never spoken to him, other than in writing.").)

### 4.    The Law Firm

**[FF31]**    The Taxpayers were generally familiar with investing because of their ownership interests in the Law Firm. The Law Firm hired Laszlo Birinyi of New York to handle the Law Firm's portfolio. (Tr. I at 51:4–6 (Patterson), 179:5–17 (Roach).)

**[FF32]**    The Law Firm earned a substantial profit from the tobacco litigation. (Tr. I at 51:18–52:10 (describing meetings with investment bankers about securitizing the tobacco litigation fees).)

**[FF33]**    After the tobacco litigation settled, several investment bankers approached the Taxpayers, as well as other states and attorneys affiliated with the tobacco litigation, about securitizing their fees. (Tr. I at 51:21–52:10.) During those meetings, the bankers raised the prospect of using some of the securitized funds to invest in foreign currency. (Tr. I at 52:9–10.)

### F.    Initial Interest in Foreign Currency Investments Was Motivated by Potential for Profit

### 1.    Nix

**[FF34]**    Sometime in early 2000, Mr. Patterson discussed his research, and his inclination to actively seek potential investments in foreign currency, with his partner Mr. Nix.

(Tr. I at 55:8–55:16 (Patterson); Tr. II at 49:8–23 (Nix).) Mr. Patterson and Mr. Nix then decided to work together to actively seek out opportunities to invest in foreign currencies. (Tr. II at 49:17–51:14); *Klamath*, 472 F. Supp. 2d at 888-89.

[**FF35**]    Mr. Nix's initial interest in foreign currency investments was motivated by a potential for profit. (Tr. II at 51:3–14 (Nix); *accord* Joint Ex. A at Tr. 143:24–144:11 (Cohen testifying that the initial discussions about foreign currency investments did not include a discussion of tax benefits).)

[**FF36**]    Mr. Nix testified that Mr. Patterson told him there was a possibility of making a substantial amount of money by purchasing foreign currency. (Tr. II at 49:8–23.)

[**FF37**]    Mr. Nix also testified that he believed there was genuine opportunity for profit when he decided to invest in foreign currency. (Tr. II at 50:10–12.)

[**FF38**]    Mr. Nix also testified that he understood there could be potential (perhaps substantial) tax benefits when he decided to invest in foreign currency. (Tr. II at 50:13–20.)

[**FF39**]    When asked whether the potential for tax benefits or the potential for profit was more important, Mr. Nix testified that he was most interested in the potential "to hit the sweet spot." (Tr. II at 51:3–14.) This was based on his experience with oil and gas deals and the excitement of high risk deals. (*Id.*)

[**FF40**]    The Court finds Mr. Nix's testimony credible.

### 2.    Patterson

[**FF41**]    Mr. Patterson testified that he was first approached about foreign currency investments during the meetings with investment bankers about securitizing fees from the tobacco litigation. (Tr. I at 52:5–10.) These investment bankers from New York introduced foreign

currency investments as a way to "add another layer to have complete diversification" of his portfolio. (Tr. I at 52:5–15.)

**[FF42]**    He also understood from Mr. Cox, who Mr. Patterson believed to have expertise in foreign currency investments because he owned a profitable family trading company in New York, that it was important to look globally for investments. (Tr. I at 54:18–21); *accord Klamath*, 472 F. Supp. 2d.at 888–89.

**[FF43]**    Mr. Patterson became convinced that, while investing in foreign currencies was risky, it provided the potential to make substantial profits. (Tr. I at 54:12–55:4.)

**[FF44]**    Mr. Patterson testified that he did not initially know that investments in foreign currencies could be structured to produce tax benefits. (Tr. I at 54:3–7 ("Q: When you had these discussions with Mr. Cox or – or Chase or whoever it was at the Wall Street firms that – that first mentioned these foreign currency investments to you, was there any discussion of tax benefits? A: No."), 56:2–6 ("Q: When you approached Pollans & Cohen about investing in foreign currency, did you have any understanding that those types of transactions could be structured in a way to produce tax benefits? A: No.")); *see also* Joint Ex. A at Tr. 143:24–144:11 (Cohen testifying that the initial discussions about foreign currency investments did not involve any discussion of tax benefits). While he became aware of the possibility that these types of investments could produce tax losses, he further testified that he did not know anything about the size of the tax losses until he had actually claimed his tax losses from his investments with Presidio. (Tr. I at 59:12–20.)

**[FF45]**    Mr. Patterson's initial interest in foreign currency investments was motivated by a potential for profit, not by a potential for tax benefits. (Tr. I at 54:3–56:17 (describing Mr. Patterson's initial conversations about foreign currency investments); *accord* Joint Ex. A at Tr.

143:24–144:11 (Cohen testifying that the initial discussions about foreign currency investments did not include a discussion of tax benefits).)

**[FF46]**     The Court finds Mr. Patterson's testimony credible.

### 3.     Roach

**[FF47]**     Mr. Roach testified that he was first approached by Mr. Patterson and Mr. Nix about the idea of investing in foreign currencies when he was going through his divorce. (Tr. I at 186:14–187:2.) He could not invest with them at that time because of his pending divorce. (*See id.*)

**[FF48]**     Mr. Roach also testified that he had discussions with both Mr. Patterson and Mr. Nix about the foreign currency transactions as well as Mr. Pollans and Mr. Cohen. (Tr. I at 187:3–20.)

**[FF49]**     While the potential for tax benefits did play into Mr. Roach's decision to invest, Mr. Roach testified that his primary consideration was the potential for earning a return. (Tr. I at 200:13–201:3; *see also* Joint Ex. A at Tr. 143:24–144:11 (Cohen testifying that the initial discussions about foreign currency investments did not involve any discussion of tax benefits).)

**[FF50]**     Mr. Roach's initial interest in foreign currency investments was thus motivated by a potential for profit, not by a potential for tax benefits. (Tr. I at 200:13–201:3 (Roach); *accord* Joint Ex. A at Tr. 143:24–144:11 (Cohen testifying that the initial discussions about foreign currency investments did not include a discussion of tax benefits).)

**[FF51]**     The Court finds Mr. Roach's testimony credible.

### G.    Pollans & Cohen

**[FF52]**    Pollans & Cohen was a reputable accounting firm started by Al Pollans and Ed Cohen. (Joint Ex. A at Tr. 142: 1–4.) Both Mr. Pollans and Mr. Cohen were former long-time partners at Arthur Andersen. (Tr. I at 58:14–21, 116:1–7, 188:21–188:6.)

**[FF53]**    Mr. Cohen had a degree in business from Northwestern University and 20 years of experience as a certified public account ("CPA") mostly spent at Arthur Andersen as a partner. (Joint Ex. A at Tr. 141:1-25.) Following his time at Arthur Andersen, Mr. Cohen moved to Beaumont, Texas to start Pollans & Cohen. (Joint Ex. A at Tr. 142:1–4.) Mr. Cohen had experience in assisting clients with investment opportunities. (*Id.* at 142:5–25.)

**[FF54]**    The Law Firm became acquainted with Pollans & Cohen through the tobacco litigation. (Tr. I at 50:20–25 ("[W]e became acquainted with the firm of Pollans & Cohen through the tobacco litigation. They had done some work in the tobacco litigation. And we asked them to first come and audit our firm, and they did an audit of the firm. And subsequent to that, we hired them to actually start doing our law firm returns.")); Joint Ex. A at Tr. 143: 8–14; *Klamath*, 472 F. Supp. 2d at 889.

**[FF55]**    The Taxpayers were impressed with the work of Pollans & Cohen and their understanding of complicated accounting issues. (Tr. I at 188:7–15 (Roach); Tr. II at 53:7–20 (Nix).) Based on the experience of Mr. Pollans and Mr. Cohen, the Taxpayers decided to hire them to provide other services for the Law Firm because the Law Firm's financial picture had become more complicated. (Tr. I at 188:7–20 (Roach).) Pollans & Cohen marketed themselves "as the chief financial officer for small clients who didn't need a full-time chief financial officer." Joint Ex. A at Tr. 142:1–11.

12

**[FF56]**    The Taxpayers believed that Mr. Pollans and Mr. Cohen were well qualified to advise them, because they recognized Arthur Andersen as being one of the largest and best accounting firms in the country. (Tr. I at 188:21–25 (Roach).) Pollans & Cohen began by auditing the Law Firm's books and preparing the tax returns for the Law Firm and some of its partners. (Tr. I at 50:19–25; 116:21–117:1 (Patterson).)

**[FF57]**    One of the services that Mr. Cohen provided his clients, including the Taxpayers, was "seeing if a particular investment strategy fit their goals and objectives and their risk tolerances." Joint Ex. A at Tr. 142:15–17, 143:11–14. He also weighed the clients' goals in determining the proper mix of investment assets for them and occasionally investigated whether investments would be profitable. Joint Ex. A at Tr. 142:18–143:3, 143:11–14.

**[FF58]**    When Mr. Nix and Mr. Patterson developed an interest in investing in foreign currencies, they turned to Mr. Pollans and Mr. Cohen, and asked them to help them look for potential investments. (Tr. I at 55:11–19, 56:7–17 (Patterson), 56:7–11 (Patterson); Tr. II at 49:8–50:3 (Nix).) It was reasonable for Mr. Patterson and Mr. Nix to contact Pollans & Cohen for advice on potentially investing in foreign currency because they had previously advised the Taxpayers on other investment opportunities. (*See, e.g.*, Tr. I at 55:17–56:1.)

**[FF59]**    Mr. Nix and Mr. Patterson told Mr. Cohen that they were interested in foreign currency because they were looking for investments that could produce sizeable returns, although they recognized that would likely entail significant risk. (Tr. I at 54:12–55:4, 56:2–6 (Patterson); Tr. II at 49:24–51:14 (Nix)); Joint Ex. A at Tr. 143:15–144:11. The Taxpayers did not ask Mr. Cohen to find investments with particular tax consequences. Joint Ex. A at Tr. 143:15–144:11.

**[FF60]**    After these initial conversations, the Taxpayers developed a "longstanding professional relationship" with Mr. Cohen "about investing in foreign currency." (Dkt. No. 40-1

at 23 (Stipulated Facts from *NPR* Proceedings); Tr. I at 55:17–56:1 (Patterson), 187:22–188:7 (Roach).)

**[FF61]**    The Court finds that the Taxpayers developed a great deal of confidence in Pollans & Cohen, and reasonably relied on their expertise in financial affairs.

### H.    <u>Klamath Investments</u>

#### 1.    <u>The Transaction</u>

**[FF62]**    Ultimately, Mr. Nix and Mr. Patterson decided to invest in foreign currencies, and they did so for the first time in 2000. (Tr. I at 57:25–58:5, 58:22–59:2 (Patterson).) The foreign currency investments Mr. Nix and Mr. Patterson made in 2000 were the subject of the Klamath Partnership-Level Proceeding (hereinafter, "the Klamath Investments").

**[FF63]**    Mr. Cohen introduced Mr. Nix and Mr. Patterson to Presidio, a firm from California that was familiar with foreign currency investments, and Mr. Nix and Mr. Patterson both met with Presidio in Houston. (Tr. I at 56:18–57:24.)

**[FF64]**    Mr. Nix and Mr. Patterson invested with Presidio.[3] (Tr. I at 57:25–58:5.) Mr. Roach did not. (*Id.*)

**[FF65]**    Prior to making these investments, it was reasonable for Mr. Nix and Mr. Patterson to rely on Pollans & Cohen to research the investments, and to trust their advice on the potential investments. (Tr. I at 58:6–13 (Patterson)); FF52–61.

**[FF66]**    The investments with Presidio were not profitable, and both Mr. Nix and Mr. Patterson eventually withdrew from the investments. (Tr. I at 58:22–59:11 (Patterson).) Despite this, Mr. Nix and Mr. Patterson remained interested in making foreign currency-related

---

[3] A more detailed recitation of the background of the Klamath Investments can be found in the Klamath Partnership-Level Proceeding, *supra* note 1.

investments because they sought "high-risk, high reward" transactions. (Tr. I at 59:3–11, 68:15–19 (Patterson).)

**[FF67]**    Both Mr. Nix and Mr. Patterson claimed tax losses from their investments with Presidio. (*See e.g.*, Tr. I at 59:12–14 (Patterson).)

## 2.    Tax Advice from Olson Lemons PC

**[FF68]**    Both Mr. Nix and Mr. Patterson received a tax opinion letter from Olson Lemons PC which advised them that "it is 'more likely than not' that the 20% accuracy-related penalty under Section 6662 of the Internal Revenue Code (the "6662 Penalty") should not be successfully asserted." (DX257 (Letter from Olson Lemons LLC to Mr. Sid Cohen for "Rogue Ventures LLC and St. Croix Ventures LLC"); *see also* Tr. I at 19–24 (Patterson).)

**[FF69]**    On April 17, 2002, Mr. Cohen received a letter from Mr. Bruce Lemons alerting them to a disclosure initiative in IRS Announcement 2002-2. (DX257; Tr. I at 60:20–61:7 (Patterson).) The letter informed them that they could disclose the Klamath transactions under this initiative and avoid penalties. (*See* DX257.) The letter also stated that "it was virtually certain that the Internal Revenue Service will audit the tax returns of the taxpayers for the year ended December 31, 2000," and it "urg[ed] [Mr. Nix and Mr. Patterson] to comply with the Disclosure Initiative" to avoid risk. (*Id.*)

**[FF70]**    The next day Mr. Patterson inquired further asking whether Mr. Lemons' previous opinion that "the transaction is both legal and the tax consequences are valid" was still valid, and if he had new legal authorities and rationales that changed his opinion. (PX84 (Letter from Mr. Patterson to Mr. Lemons); Tr. I 61:17–62:9 (Patterson).)

**[FF71]**     Mr. Lemons wrote back assuring Mr. Patterson that Olson Lemons "firmly [stood] behind all of [their] more likely than not opinions, including a more likely than not opinion regarding penalties." (PX86; Tr. I 62:16-23 (Patterson).)

**[FF72]**     He apologized for causing concern and stated that he "firmly [stood] behind all of [his] more likely than not opinions, including a more likely than not opinion regarding penalties, that [were] set forth in the opinion letter [he] delivered." (*Compare* PX84 (Letter from Mr. Patterson to Mr. Lemons), *with* PX86 (Letter from Mr. Lemons to Mr. Patterson); *see also* Tr. I at 62:14–23 (Patterson).) Mr. Lemons explained that he had not intended "to cause any undue concern" and the announcement was only a way to reduce risk inherent in tax planning. (*See* PX86.)

**[FF73]**     Although Mr. Lemons' original letter put Mr. Nix and Mr. Patterson on notice of IRS Announcement 2002-2 Disclosure Initiative, it was reasonable for Mr. Nix and Mr. Patterson to rely on Mr. Lemons' tax opinion that the underlying Klamath transactions were both legal and valid. (*See* PX86 (Letter from Mr. Lemons to Mr. Patterson) ("Again, we apologize for any confusion and reiterate that we do stand behind all of our more likely than not opinions.").)

**[FF74]**     The record reflects no basis for a finding that it was not reasonable for the Taxpayers to rely on the tax advice from Olson Lemons.

### 3.     <u>Tax Advice from Holland & Hart</u>

**[FF75]**     Both Mr. Nix and Mr. Patterson also received a tax opinion letter from Holland & Hart (collectively, the "Holland & Hart Letters"). (Tr. I at 19–24, 135:6–8 (Patterson); Tr. II at 58:12–59:2 (Nix); *see also* DX101 (Patterson's Letter); DX102 (Nix's Letter).)

**[FF76]**    The Holland & Hart Letters spanned one-hundred nineteen (119) pages and included a detailed analysis of the relevant authorities and case law pertaining to federal tax treatment of transactions similar to the Klamath transactions. (DX101; DX102.)

**[FF77]**    The Holland & Hart Letters both concluded that "there is a greater than 50 percent likelihood that the IRS would not be successful were it to attempt to impose a penalty against you under Section 6662(b)(2)." (*See, e.g.*, DX101 at P01389.)

**[FF78]**    The Holland & Hart Letters both addressed the IRS Notice 2000-44 and concluded that "[i]t is more likely than not that the authorities cited in Notice 2000-44 would not provide a basis for denying the deduction of a loss sustained from the transactions at issue here." (*See, e.g.*, DX101 at P01484–01487, P01487.)

**[FF79]**    The record reflects no basis for a finding that it was not reasonable for the Taxpayers to rely on the tax advice in the Holland & Hart Letters.

### 4.    Notice 2000-44

**[FF80]**    The Notice 2000-44 was released after Mr. Patterson and Mr. Nix withdrew from the Klamath Transactions. (*Compare* DX101 at P01386 (termination date of June 12, 2000), *with* DX101 at P01484 ("On August 11, 2000, the IRS released Notice 2000-44."); *see also* Dkt. No. 40-1 at 22 (Stipulated Facts from *NPR* Proceedings).)

**[FF81]**    Mr. Patterson testified that he first learned of Notice 2000-44 in the Holland & Hart Letters. (Tr. I at 111:14–17.)

**[FF82]**    Mr. Nix testified that he read the Holland & Hart Letters but that he did not remember any discussions regarding Notice 2000-44. (Tr. II at 59:16–21.)

**[FF83]**    Based on the record before the Court, the Court finds that Mr. Patterson and Mr. Nix's belief that Notice 2000-44 did not apply to the Klamath Transactions was reasonable in light of the Holland & Hart Letters.

**[FF84]**    Based on the record at trial, the Court finds that the discussion of Notice 2000-44 in the Holland & Hart Letters did not put Mr. Patterson or Mr. Nix on notice that the Klamath Investments were likely "listed transactions."

### 5.    <u>Senate Report Discussing BLIPS Transaction</u>

**[FF85]**    In 2003, the United States Senate Permanent Subcommittee on Investigations released a report titled "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals, Four KPMG Case Studies: FLIP, OPIS, BLIPS, and SC2 – Report Prepared by the Minority Staff of the Permanent Subcommittee on Investigations" (the "Senate Report"), which discussed BLIPS transactions. (*See* DX246 at 10.) The Senate Report spans 129 pages and does not specifically reference the Klamath transaction. (*See generally id.*)

**[FF86]**    Mr. Patterson testified that he never came across the Senate Report that discussed the BLIPS transaction. (Tr. I at 137:4–138:22; *see also* DX246.)

**[FF87]**    Despite arguing that this Senate Report was "available to the Taxpayers" and thus the Taxpayers were on notice that the transactions underlying the Klamath Investments were not proper, the Government only questioned Mr. Patterson on his knowledge of the Senate Report. (*See generally* Tr. I and Tr. II.)

**[FF88]**    The Government did not present any expert testimony that Mr. Patterson or Mr. Nix should have seen the Senate Report or should have had notice of it.

**[FF89]**    Based on the record at trial, the Court finds that Mr. Patterson and Mr. Nix did not have knowledge of the Senate Report nor should they have known about the Senate Report.

## I.    NPR Investments

### 1.    Description of the "Paired Option" Transaction

**[FF90]**    After the Klamath Transactions, Mr. Patterson had a continued interest in investing in foreign currencies because he was looking for a high risk, high reward type of investment. (Tr. I at 68:11–69:2.)

**[FF91]**    Around this time, Mr. Roach's divorce was finalized and he was able to make investments. (Tr. I at 186:18–187:2 (Roach).) He expressed an interest in investing in foreign currencies with Mr. Nix and Mr. Patterson. (*See id.*)

**[FF92]**    In 2001, the Taxpayers expressed to Mr. Cohen their continued interest in investing in foreign currencies because, though investing in foreign currencies was risky, such investments carried the possibility of returns not achievable in traditional investments, such as stocks and bonds. Joint Ex. A at Tr. 143:15–17, 143:23–144:7 (Cohen testifying that "the traditional sources of investments, stocks and bonds and things like that, just did not provide [the Taxpayers] the – the kinds of returns [the Taxpayers] were looking for.").

**[FF93]**    Mr. Cohen approached Mr. Patterson about another foreign currency investment opportunity through a company called the Diversified Group, Inc. ("Diversified" or "DGI"). (Tr. I at 69:6–24); Joint Ex. A at Tr. 144:12–145:12 (Cohen testifying that he introduced the Taxpayers to Diversified because he "felt that what the Diversified Group was offering seemed to fit within what the clients wanted."). Mr. Patterson understood that Diversified was a group out of New York that was involved in foreign currency transactions, and other clients of Pollans & Cohen had positive experiences using Diversified to invest in foreign currency matters. (Tr. I at 69:6–24.)

**[FF94]**    After discussing Diversified with Mr. Nix and Mr. Roach, Mr. Patterson flew to New York to meet with Mr. Haber and Mr. Tan from Diversified. (Tr. I at 70:6–11, 71:16–24.)

**[FF95]**    At these initial meetings, Mr. Patterson acted as the Taxpayers' representative. Mr. Roach and Mr. Nix appointed Mr. Patterson as their agent to represent them in these discussions. (Tr. II at 13:10–14:1 (Roach), 49:8–23 (Nix)); *see also NPR Invests., LLC ex rel. Roach v. U.S.*, 732 F. Supp. 2d 676, 681 (E.D. Tex. 2010). Therefore, the Court finds that Mr. Patterson's testimony about these meetings and discussions is both reliable and representative of Mr. Roach's and Mr. Nix's positions, as well as Mr. Patterson's personal position.

**[FF96]**    During the meetings, Mr. Haber and Mr. Tan explained, in detail, the function and effect of a paired option transaction, including how the transaction itself functioned, what could happen, how it could happen, the potential for profit, and possible tax benefits. (Tr. I at 72:1– 16.)

**[FF97]**    Most of the meetings in New York were devoted to Mr. Haber explaining to Mr. Patterson and Mr. Cohen how the proposed investments could be profitable. (Tr. I at 72:3–20 (Patterson).)

**[FF98]**    There were two ways the paired option transaction could be profitable: (1) if the spot price at the pay-off date was "in the money," which means the spot price exceeded both strike prices (long and short), or (2) if the spot price at pay-off date was "in the sweet spot", which was a spot price greater than the short strike price but less than the long strike price. (Tr. I at 73:22– 74:20, 79:5–9, 109:4–7; PX60 at NPR-002188.) If the spot price at the pay-off date was less than both strike prices, then the investor would pay nothing and receive nothing. (Dkt. No. 40-1 at 4 (Stipulated Facts from *NPR* Proceedings).)

**[FF99]**      While the potential tax benefits of these types of transactions was also discussed as part of these meetings, the emphasis was on the potential profit. (Tr. I at 76:24–77:6 ("Q: In the context of that meeting, was the emphasis on the potential profit, was it on tax benefits, something else? A: There was no question it was on potential profit.").)

**[FF100]**      There was a 25% chance that the spot price at the pay-off date would be "in the money." (Tr. I at 76:9–13, 79:10–18; *see, e.g.*, PX60 at NPR-002190 (showing 25% "Profitability of Profit" for both the Japanese Yen and Australian Dollar).)

**[FF101]**      While there was a potential for a slight profit if the price ended up "in the money," it was the potential for a huge profit if the price ended up "in the sweet spot" that ultimately drove the Taxpayers' interest in this particular type of transaction. (Tr. I at 81:24–82:6 ("Q: As between -- on this page the -- let's just take the Japanese Yen trade, the $890,000.00 you could have made if both options were in the money and the $48 million that you could have made if -- if the reference price ended up in the sweet spot, how important was all that to you? A: Well, there really wasn't enough profit in just going through the first two to pique our interest of doing this particular transaction. The sweet spot was the thing that really got our interest and -- and was the real reason that we actually got into the transaction.").)

**[FF102]**      While the Taxpayers were aware that hitting the "sweet spot" was unlikely, it was not impossible as the Taxpayers were told that others had hit the sweet spot in these types of transactions. (Tr. I at 82:10–17,83:2–6 (Patterson).)

**[FF103]**      Diversified also explained how the investment could be profitable even considering the fees that were paid to both Diversified and the attorneys at Sidley Austin. (Tr. I at 77:25–79:18, 109:4–7; *see, e.g.*, PX60 at NPR-002190 (showing a "Net Potential Profit" of $202,745 including $375,000 of fees).) This profitability did not require the options to land "in the

sweet spot" to be profitable. (Tr. I at 79:2–21 (discussing how the chart in PX60 at NPR-002190 reflects the potential profitability if the strike prices are "in the money" not "in the sweet spot"); *see, e.g.*, PX60 at NPR-002190.)

[FF104]    A similar "profitability analysis" chart was provided to each of the Taxpayers. (*See* PX59 (Nix); PX60 (Patterson); PX61 (Roach); *see also* Tr. I at 79:2–21 (Patterson), 215:12–23 (Roach); Tr. II at 61:9–14 (Nix).) All three charts showed a 25% chance of being "in the money," which would produce a potential net profit for both currency options including the fees paid to both Diversified and the Sidley Austin attorneys. (*See* PX59 at DOJ-00009 (net potential profit of $207,170 and $206,366); PX60 at NPR-002190 (net potential profit of $202,745 and $254,468); PX61 at NPR-002022 (net potential profit of $118,931 and $145,558).)

[FF105]    Given the Taxpayers' relationship with Pollans & Cohen, it was reasonable for the Taxpayers to rely on Mr. Pollans' and Mr. Cohen's advice regarding this investment offered by Diversified.

[FF106]    The Taxpayers were familiar with this sort of "high-risk and high-reward" investment because they had made similar investments before and because this approach was mirrored in their particular practice of law. (Tr. I at 182:18–83:1 (Roach).)

## 2.    Meetings with Sidley Austin

### a.    Initial Meeting with Sidley Austin

[FF107]    In 2001, Mr. Patterson first met with R.J. Ruble of Sidley Austin in New York. (Tr. I at 90:20–92:19 (discussing initial meeting with R.J. Ruble).)

[FF108]    Mr. Ruble was a tax attorney with Sidley Austin. (Tr. I at 76:21–23; Joint Ex. A Tr. at 146:3–6, 146:20–147:5 (Mr. Cohen describing the meeting with R.J. Ruble and R.J. Ruble's expertise in partnership tax matters).) Both Mr. Patterson and Mr. Cohen believed Sidley

Austin to be a reputable firm that was qualified to provide competent tax advice. (Tr. I at 90:24–91:11; Joint Ex. A Tr. at 147:6–17 (Mr. Cohen's testimony regarding his experience with Sidley Austin while a partner at Arthur Andersen).) Mr. Cohen recognized R.J. Ruble as a tax expert on partnership matters. Joint Ex. A Tr. at 146:23–147:5, 161:7–10.

[FF109]   Mr. Nix likewise believed that Sidley Austin was a "highly qualified, outstanding firm." (Tr. II at 54:10–14.)

[FF110]   Mr. Roach testified that the Law Firm turned to Sidley Austin for a "really smart tax person" to handle the restructuring of the partnership. (Tr. I at 205:8–17.)

[FF111]   Mr. Patterson and Mr. Cohen met separately with Mr. Ruble, who generally explained the tax aspects of the investment. (Tr. I at 76:20–23, 90:20–94:15.) The meeting began with discussions of the profitability of the transaction, and Mr. Ruble explained that if the Taxpayers hit "the sweet spot" or were "in the money," the income would be ordinary for tax purposes. (Tr. I at 93:20–94:2 (Patterson).)

[FF112]   Mr. Ruble further explained how the investment proposed by Diversified would be treated under the Internal Revenue Code and could result in potential tax benefits, depending on whether the Taxpayers made a profit or loss from the investment. (Tr. I at 93:20–94:12 (Patterson); Joint Ex. A at Tr. 147:23–148:7 ("[Mr. Ruble] discussed the particular code section. [Mr. Ruble] described how this particular strategy would fit within the code section and would provide the -- the taxpayers with some certain, you know, benefits that -- could be realized to -- again, depending on whether they made a profit or a loss.").)

[FF113]   Mr. Ruble used a draft tax opinion to explain his analysis and conclusions. (Tr. I at 94:6–12.)

**[FF114]**    The Taxpayers had confidence in Sidley Austin because they also engaged Sidley Austin to advise them on how to restructure the Law Firm so that they could admit new partners without having those partners share in the previously earned tobacco fees. (*Compare* Tr. I at 203:25–206:1 (Roach testifying about the Law Firm's previous experience with Sidley Austin), *with* Joint Ex. A at Tr. 168:22–169:20 (Cohen testifying about discussions that he had with Sidley Austin about restructuring the Law Firm).)

**[FF115]**    Despite hiring several law firms and accounting firms to provide professional legal and accounting advice, Mr. Patterson did not have a "standard" way of conducting due diligence before hiring a professional advisor. (Tr. I at 92:20–93:16.) Rather, Mr. Patterson would rely on word of mouth, reputation, and then ask questions himself to determine who to hire. (*See id.*)

**[FF116]**    Mr. Roach similarly relied on word of mouth, reputation, and experience when hiring a professional advisor. (Tr. I at 179:18–180:4 (financial advisors), 180:25–182:3 (lawyers).)

> b.    Mr. Ruble's Potential "Conflict of Interest"

**[FF117]**    At the beginning of the afternoon meeting, Mr. Ruble informed Mr. Patterson that he had done some work for Diversified. (Tr. I at 91:17–19 (Patterson).)

**[FF118]**    Mr. Patterson inquired whether any conflict of interest existed based on Mr. Ruble's and Sidley Austin's representation of Diversified. (Tr. I at 91:20–93:16 (Patterson).) In order to determine whether a conflict of interest existed, Mr. Patterson asked Mr. Ruble a series of questions about his allegiance to Diversified and whether there was anything that would in any way impair Mr. Ruble's ability to be loyal to the Taxpayers and give them independent tax advice. (*Id.*) Mr. Ruble assured him that there was not, and Mr. Patterson was satisfied. (*See id.*)

**[FF119]**    Mr. Roach testified that he would have done the same thing that Mr. Patterson did had he been presented with the same situation. (Tr. I at 194:23–185:14.)

**[FF120]**    The Court finds that Mr. Patterson's questioning of Mr. Ruble was reasonable. He asked the appropriate questions after being put on notice that there was a potential conflict-of-interest. Based on Mr. Ruble's responses, no further action was necessary.

### 3.    Decision to Invest in the NPR Transactions

**[FF121]**    Following the meetings in New York, Mr. Patterson returned to Texas and discussed the substance of those conversations with Mr. Nix and Mr. Roach. (Tr. I at 94:16–95:20 (Patterson), 193:11–194:9 (Roach); Tr. II at 49:8–23 (Nix).) In those discussions, Mr. Patterson described how Diversified's investment strategy worked and relayed the possibility of earning substantial profits if the investments landed in the "sweet spot." (Tr. I at 94:21–95:6 (Patterson), 194:2–9 (Roach); Tr. II at 49:17–21 (Nix).) Mr. Nix testified that the Taxpayers "had discussion after discussion about all of it" and he did not make any decision "independent from them." (Tr. II at 61:5–8.)

**[FF122]**    The Taxpayers agreed to further consider the investments and tasked Mr. Cohen with more fully evaluating Diversified's proposed investment strategy. Joint Ex. A at Tr. 152:18–153:20 (Cohen testifying about his discussions with the Taxpayers); *see also* Tr. I at 194:10–195:10 (Roach). Mr. Cohen evaluated the transaction from both an economic and a tax standpoint. Joint Ex. A at Tr. 148:8–151:22 (Cohen).)

**[FF123]**    With respect to the economics of the transaction, Mr. Cohen looked at the types of options and the foreign currencies being considered and reviewed historical data regarding the movement of the foreign currencies. Joint Ex. A at Tr. 148:23–151:22 (Cohen). Mr. Cohen had meetings with each of the Taxpayers and with all of them together discussing the investment

25

potential and explaining how the investments worked. *See id.* Mr. Cohen told the Taxpayers that the NPR transaction was "risky" and "that there was a potential to make a lot of money on it, but there was a potential to lose a lot of money on it, too." (Joint Ex. A at Tr. 145:3–8 (Cohen); *see also* Tr. I at 82: 10–17 (Patterson), 194:21–195:10 (Roach).) In summary, Mr. Cohen told the Taxpayers that the "option strategies fit their goals and objectives with what they were trying to accomplish." Joint Ex. A at Tr. 153:9–17 (Cohen).

[**FF124**]    With respect to the tax aspects of the transaction, Mr. Cohen "reviewed the tax opinion that Mr. Ruble had proposed and checked out the citations and the . . . reasoning to see that it made sense to [him]." Joint Ex. A at Tr. 148:15–18; *see also* Tr. I at 94:6–12 (Patterson), 113:16–24 (Patterson), 190:11–21 (Roach), 203:2–13 (Roach). Mr. Roach testified that he had reviewed the draft tax opinion with Mr. Cohen. (Tr. I at 206:10–13, 208:23–209:4.)

[**FF125**]    Mr. Cohen recommended that the Taxpayers invest in the NPR transactions, and, based in part on that advice, the Taxpayers ultimately decided to invest in the foreign currency options. (Tr. I at 113:25–114:4 (Patterson); Tr. II at 50:4–9 (Nix)); *see also* Joint Ex. A at Tr. 153:18–20.

[**FF126**]    An important reason for each of the Taxpayers to invest in the foreign currency options was the possibility of hitting the "sweet spot." (Tr. I at 82:4–9 (Patterson), 197:19–24 (Roach); Tr. II at 51:3–14 (Nix).) The Taxpayers understood that even if the options did not land in the sweet spot, they would make a more modest profit if the options were in the money. (Tr. I at 77:4–79:21 (Patterson), 198:4–7 (Roach); Tr. II at 51:15–52:1, 61:5–14 (Nix).)

[**FF127**]    The Taxpayers discussed the probability of hitting the "sweet spot" with Mr. Cohen. (Tr. I at 82:10–17 (Patterson), 196:13–197:4 (Roach); Tr. II at 50:21–51:14 (Nix).) Mr. Cohen advised the Taxpayers that hitting the sweet spot was not a likely occurrence, but it could

happen, which is why the return on one option set was substantial. (Tr. I at 82:10–17 (Patterson), 196:13-197:4 (Roach); Tr. II at 50:4–9, 51:3–14 (Nix).)

**[FF128]**    Mr. Patterson testified that he also understood the NPR transaction was "not as risky of a venture as the Presidio [transaction], because you had two opportunities to make money" and "the profit potential [for the NPR transaction] was even higher." (Tr. I at 95:12–20; *see also* Tr. I at 109:4–7 (explaining that there were two ways to make a profit "over and above the cost of the transaction and fees").)

**[FF129]**    Mr. Patterson also testified that he was told by Mr. Haber that other investors had hit the sweet spot. (Tr. I at 83:2–6.)

**[FF130]**    Mr. Cohen explained the historical values of when the currencies had moved through the sweet spot. (Tr. I at 196:13–197:4, 216:15–219:16 (Roach); Joint Ex. A at Tr. 149:12–22.)

**[FF131]**    Mr. Roach testified about his decision to make the investment. (Dkt. No. 120 Hr'g Tr. at 197:19–201:2.) For example, Mr. Roach felt it was important that the counterparty be a large trading house to ensure that if the Taxpayers hit the sweet spot, the company could absorb the payout as part of their regular course of business. (Tr. I at 199:22–200:10.)

**[FF132]**    Mr. Roach testified that he felt it was important that there was a second potential to obtain a profit if the strike price was "in the money." (Dkt. No. 120. Hr'g Tr. at 198:2–7.)

**[FF133]**    Mr. Roach also testified that he felt it was important that "the two companies that were advising [the Taxpayers] on the transaction, Alpha, which is the multi-billion-dollar hedge fund, and then Diversified actually took a position in the partnership that we were investing in that was buying the options. In other words, they -- they each invested money, and they were the managers of the transaction." (Tr. I at 199:6–20.)

**[FF134]**    Mr. Patterson testified that the investment was "less risky" than Presidio "but the profit potential was even higher." (Tr. I at 95:12–20.)

**[FF135]**    While the options had a fixed exercise date, Mr. Roach testified that the Taxpayers were not locked into the options. (Tr. I at 218:22–219:10.) The Taxpayers could sell the options as a way to exit the transaction, but their profit would be based on the options price at that time. (Tr. I at 219:2–4.)

**[FF136]**    Mr. Roach understood that the options had a "time sensitive value." (Tr. I at 239:22–240:2.) For example, if the options were out of the money then the value of options would decrease significantly the longer time goes on. (*Id.*) The value of the options and the value of the currency were not the same thing. (Tr. II at 30:14-21 (Roach).)

**[FF137]**    Mr. Cohen then assisted the Taxpayers in implementing the transaction. He reviewed outlines of the proposed transactions provided by DGI with the Taxpayers and communicated with DGI regarding the Taxpayers' requested changes to the outlines, including the different option terms the Taxpayers requested for some options. (Joint Ex. A at Tr. 149:23–151:22, 153:21–154:6 (Cohen).) Mr. Cohen also evaluated the NPR transaction and reviewed the different currencies available. (Joint Ex. A at Tr. 148:8–18 (Cohen).) He made sure that he understood the mechanics of the transaction and how the Taxpayers would get paid. (Joint Ex. A at Tr. 148:19–149:4 (Cohen).) Mr. Cohen also reviewed the historical data provided for the currencies' strike prices. (Joint Ex. A at Tr. 149:12–18 (Cohen).) Mr. Cohen also assisted with the documentation and he monitored the investments once made by reviewing daily pricing sheets indicating where each of the foreign currency options stood. (Joint Ex. A at Tr. 154:18–155:1 (Cohen).)

[**FF138**]    The Taxpayers determined the terms of the options and the underlying currencies based on advice from DGI and after consulting with Mr. Cohen. (Joint Ex. A at Tr. 148:8–18 (Cohen); Tr. I at 97:17–98:15 (Patterson), 112:22–114:2 (Patterson), 154:24–155:7 (Patterson), 216:15–219:16 (Roach); Tr. II at 49:24–50:9 (Nix), 50:21–51:2 (Nix).) The Taxpayers were active in picking which options they purchased, selecting different terms and currencies based upon their own risk tolerances. (Tr. I at 98:1–15 (Patterson), 217:5–218:12 (Roach); Joint Ex. A at Tr. 149:23–151:21, 152:18–153:17 (Cohen's testimony regarding investment planning discussions with Mr. Patterson, Mr. Nix, and Mr. Roach).) For example, Mr. Roach selected the Canadian Dollar, because it was historically "stable" and "slow moving." (Tr. I 217:5–219:16 (Roach).)

[**FF139**]    The Taxpayers contributed their membership interests in their single-member LLCs (through which they had acquired the options) to NPR because they wanted to pool their chances of one of the six sets of options hitting the sweet spot, and to take advantage of DGI's and Alpha's expertise through their management of NPR. (Tr. I at 98:18–100:15 (Patterson), 211:24–212:8 (Roach).) The Taxpayers felt more assured about the transaction because DGI and Alpha put their money in as well. (Tr. I at 100:10–15 (Patterson), 199:4–20 (Roach); Tr. II at 50:21–51:2 (Nix).)

[**FF140**]    DGI and Alpha each contributed $50,000 ($100,000 combined) to the NPR Investments. The Court finds as credible the Taxpayers' testimony that they felt more assured about the transaction because DGI and Alpha contributed some of their own money to participation in the investment. (Tr. II at 27:22–28:11 (Roach); *see also* PX61 at NPR-002121.)

**[FF141]**    Mr. Nix and Mr. Patterson each directly paid DGI a fee of $750,000 and Mr. Roach directly paid DGI a fee of $450,000. (Tr. I at 144:22–24 (Patterson); Tr. II at 27:13–14 (Roach), 61:19–22 (Nix)); *see also NPR Investments*, 732 F. Supp. 2d at 681.

**[FF142]**    Mr. Nix and Mr. Patterson each directly paid Mr. Cohen a fee of $250,000 and Mr. Roach directly paid Mr. Cohen a fee of $150,000. (Tr. I at 144:25–145:8 (Patterson); Tr. II at 27:15–16 (Roach), 62:69 (Nix); *see also* Joint Ex. A at Tr. 169:21–170:13 (Cohen).) Mr. Cohen estimated that he spent "at least a thousand hours" in connection with advising the Partners on the transaction. (Joint Ex. A. at 170:10–13.) Mr. Cohen and the Taxpayers agreed to the fee, and the fee was never expressed as "some percentage of the tax consequences." (Joint Ex. A at Tr. 170:1–9 (Cohen).) The Taxpayers understood the fee to be a flat fee and covered Mr. Cohen's work "in terms of both tax and investment advice regarding [the NPR] transaction." (Tr. I at 226:19–227:4 (Roach).) Mr. Cohen and the Taxpayers agreed to the fee after discussion about what would be reasonable. (Joint Ex. A at Tr. 170:1–3 (Cohen).)

**[FF143]**    Mr. Cohen noted the fee the Taxpayers paid to him could be presented as a percentage of the long option. (Joint Ex. A at Tr. 179:16–19, 217:19-218:5 (Cohen).) The Fifth Circuit noted that the "fees were based on a percentage of the tax losses that the investment strategy was expected to generate," *NPR Investments*, 740 F.3d at 1003. However, Mr. Roach and Mr. Cohen testified that they had no knowledge that the fee was a percentage of the tax losses because the the fee was never presented to them as such. (Tr. I at 226:19–227:4 (Roach); Joint Ex. A at Tr. 170:4–9 (Cohen).)

**[FF144]**    The Court finds that these advisory fees were a flat fee (set as a percentage) and not fees for services to be rendered over time. (Joint Ex. A at Tr. 172:12–174:15 (Cohen).)

[**FF145**]    The Parties have stipulated that Diversified also paid Mr. Cohen "a referral fee of $325,000, although the Taxpayers were unaware of this until after the IRS had completed its audit of NPR." (Dkt. No. 40-1 at 24 (Joint Stipulation of Facts from *NPR* Proceeding).) Mr. Cohen did not know he would receive such a fee until after the Taxpayers entered into the transaction. (Joint Ex. A at Tr. 170:18–22 (Cohen).) The Taxpayers were not aware that Mr. Cohen received a fee from Diversified until the NPR transaction was being litigated. They were upset to learn he received this fee. (Tr. I at 227:5–229:10 (Roach); Tr. II at 72:9–16 (Nix); *see also* Dkt. No. 40-1 at 24 (Joint Stipulation of Facts from *NPR* Proceeding).)

[**FF146**]    The Taxpayers believed that the foreign currency transactions had significant profit potential. (Tr. I at 86:12–20 (Patterson), 109:4–7 (Patterson), 198:4–7 (Roach), 201:9–202:3 (Roach); Tr. II at 50:10–12 (Nix).) While the potential tax benefits played a significant role in their decision to make the investments, it was the potential for profit and not tax consequences which were the primary purpose in deciding to invest. (Tr. I at 95:21–96:2 (Patterson), 200:13–201:2 (Patterson); Tr. II at 51:3–14 (Nix).)

[**FF147**]    If the Taxpayers had been motivated solely by the potential to generate tax losses, they could have made a second round of investments with Presidio. (Tr. I at 68:24–69:2 (Patterson).)

### 4.    <u>Withdrawal from NPR</u>

[**FF148**]    As previously stipulated by the Parties:

On December 18, 2001, all three Taxpayers withdrew from NPR. (P–Exh. 26 at PC06320; P–Exh. 27 at NPR002189; P–Exh. 28 at NPR002021; Tr. 1 at 71–73, 248–49; Tr. II at 25–26.) In exchange for their partnership interests, they received cash and foreign currencies representing the fair market value of their interests in NPR as of December 18, 2001. (Id.) The Taxpayers then contributed their foreign currencies to a different partnership through which they operated their Law Firm. Inside of the Law Firm, all gains or losses on these foreign currencies were to be specially allocated to their respective contributing partners on the Law Firm's books and tax returns such that the Law Firm's other partners did not

receive any gain or loss from these foreign currencies. (Tr. I at 186–190.) The losses from these foreign currency sales were listed in a "Business Risk Division" on the Law Firm's tax returns. (Id.) When the foreign currencies were sold in 2001, 2002, and 2003, the Law Firm offset these losses against the income allocated to each Taxpayer to reduce the earned income shown on Schedules K–1 issued to the Taxpayers by the Law Firm. (See, e.g., P– Exh. 6.)

(*See generally* Dkt. No. 40-1 (Joint Stipulation of Facts from *NPR* Proceeding).)

**[FF149]**    Each Taxpayer initially intended to remain in the NPR transaction through the options' expiration. (Tr. I at 101:25–102:7 (Patterson), 102:23–25 (Patterson), 219:21–24 (Roach), 221:18–23 (Roach); *cf.* Tr. II at 52:2–17 (Nix); Joint Ex. A Tr. at 156:23–25 (Cohen).) Mr. Nix and Mr. Patterson's investments were profitable early on, but Mr. Roach's was not. (Tr. I 221:1–13, 220:20–222:1, 238:22–239:4 (Roach).)

**[FF150]**    Each of the Taxpayers knew that withdrawing from NPR Investments eliminated any possibility of "hitting the sweet spot" and therefore that an exceptional profit was no longer impossible. (*See* Dkt. No. 40-1 at 24 (Joint Stipulation of Facts from *NPR* Proceeding).)

**[FF151]**    Beginning in 1999, Mr. Roach was going through a divorce which left him illiquid, due to court ordered restrictions on his accounts. (Tr. I at 173:5–174:2 (Roach).) In September of 2001, the divorce was finalized and Mr. Roach was released from those court ordered restrictions. (Tr. I at 174:3–7 (Roach).)

**[FF152]**    As part of his obligations under the finalized divorce decree, Mr. Roach had to execute a note for four and half million dollars. (Tr. I at 186:3–7 (Roach); *see also* DX266 (loan agreement with Century Bank); DX268 (loan payment receipts).) The note required that Mr. Roach make quarterly payments of over $400,000. (Tr. I at 186:3–7, 241:14–242:8 (Roach); *see also* DX266, DX268.)

**[FF153]**    While he had chosen the Canadian dollar as the currency for one of his options pairs for its relative security, the value of that option pair dropped dramatically soon after Mr. Roach acquired it. (Tr. I at 220:20–222:1, 238:22–239:4 (Roach).)

**[FF154]**    Around thirty days into the investment, Mr. Roach was consulting with Mr. Cohen every day in an attempt to figure out what was happening to the value of the options.  (Tr. I at 221:18–23 ("[MR. ROACH:] "And at some point, I don't know a week or -- or, you know two weeks after I started in this transaction, I'm getting this. I'm talking on the phone virtually every day with Mr. Cohen because I'm not in a position to take this loss."), 239:5–10 (Roach).) Mr. Cohen advised him that since the Canadian dollar had historically moved slowly, he was not sure whether the value would recover. (Tr. I at 239:11–15 (Roach).)

**[FF155]**    Mr. Roach's investment did not initially perform as predicted because the Canadian dollar did not do what it had historically done. (Tr. I at 220:20–221:13, 237:24–242:8 (Roach).) The Canadian dollar declined in value on a daily basis, which was different than its historically slow movement. (*See id.*)

**[FF156]**    Considering his post-divorce financial status, the stability of the Canadian dollar was a factor that played into Mr. Roach's initial decision to invest in foreign currency. (Tr. I at 220:20–222:2, 237:24–242:8 (Roach).) When the Canadian dollar started declining in value, Mr. Roach became very concerned. (*See id.*)

**[FF157]**    In addition to increasing fears of missing the sweet spot, Mr. Roach began to worry that the options would be worthless if the Canadian dollar moved too far from the strike price. (Tr. I at 239:11–21 (Roach).) Based in part on his prior experience with options, Mr. Roach testified that he believed options were time sensitive, meaning the value could decrease

significantly the closer it got to the expiration date, so that if he waited too long the options could become worthless. (Tr. I at 176:18–177:3, 239:22–240:2.)

**[FF158]**    Mr. Roach felt that he had to withdraw from the investment. He was concerned about the decreasing value of his investment and he knew that he would soon be required to make a $400,000 payment on the note from his divorce property settlement. (Tr. I at 237:24–242:8.) While Mr. Roach had always intended to stay in the transaction, the obligation on the note coupled with his investment's initial failure to perform at desired levels convinced Mr. Roach to withdraw—thus salvaging some of the investment—and use some of the proceeds to meet his other financial obligations. (Tr. I at 238:22–240:2; 241:24–242:8.)

**[FF159]**    Mr. Roach made his intention to withdraw from NPR known to Mr. Nix and Mr. Patterson, because the three of them had invested in the foreign currency transactions as a group. (Tr. I at 102:8–103:7 (Patterson), 240:15–241:13 (Roach); Tr. II at 52:4–17 (Nix).) The Taxpayers had a deal amongst each other as being in the investment together, in part because the pooling of the options provided a better chance of at least one set of options hitting the sweet spot. (Tr. I at 102:10–103:4 (Patterson); Tr. II at 62:20–63:5 (Nix).) With Mr. Roach's withdrawal, the chances of hitting the sweet spot were decreased. (Tr. II at 63:2–5 (Nix).)

**[FF160]**    The Taxpayers discussed Mr. Roach's intention to exit NPR, and Mr. Nix made it known to Mr. Patterson that if Mr. Roach withdrew, he would as well. (Tr. II at 52:8–17 (Nix).) Mr. Nix and Mr. Patterson were upset about Mr. Roach's decision to withdraw because they had originally planned on staying in the transaction at least until the expiration of the options. (Tr. I at 102:14–25 (Patterson), 240:15–241:13 (Roach).)

**[FF161]**    Knowing all of this, Mr. Roach testified that the decision to withdraw was not an easy one and marked one of the few times in his thirty-year relationship with Mr. Nix and Mr.

Patterson that he felt he had let his partners down. (Tr. I at 240:20–241:13 (Roach).) The Court finds his testimony credible.

**[FF162]**    Ultimately, Mr. Patterson and Mr. Nix both decided to also withdraw from NPR Investments. (Tr. I at 102:14–19 (Patterson); Tr. II at 52:8–17, 62:10–19 (Nix).)

**[FF163]**    On December 18, 2001, each of the Taxpayers resigned from NPR and received cash and foreign currencies as liquidation distributions for their membership interests in NPR. (PX59 at DOJ-000164 (Nix's Resignation Letter); PX60 at NPR 002356 (Patterson's Resignation Letter); PX61 at NPR 002184 (Roach's Resignation Letter). Mr. Roach's investment had decreased in value. (PX61 at NPR 00202-21.) However, Mr. Patterson and Mr. Nix generated a profit due to the value increases of the options. (PX59 at DOJ-000007-8 (Nix); PX60 at NPR002188-89 (Patterson).)[4]

**[FF164]**    The Taxpayers communicated with each other throughout the entire investment process, from the initial meetings in New York with Sidley & Austin and DGI, to the actual decision to invest, to the decision to withdraw. (Tr. II at 61:2–8 (Nix).)

**[FF165]**    On December 17, 2001, a day before the Taxpayers' formally withdrew from NPR Investments, Mox Tan emailed James ("Jimmy") Haber of DGI about instructions he had allegedly received from Mr. Cohen on behalf of the Taxpayers discussing their intention to withdraw and to generate specific amounts of future tax losses over the tax years 2001, 2002 and 2003. (DX162 at 1ALPHA-DISK03-017779.)

---

[4] Mr. Nix made a gross profit of $32,505 (fair market value received ($657,505) less capital contribution ($625,000)). Mr. Patterson made a gross profit of $82,335 (fair market value received ($707,335) less capital contribution ($625,000)). Mr. Roach lost $66,123 (fair market value received ($308,877) less capital contribution ($375,000)). (*See* PX59–60.)

**[FF166]**    Mr. Patterson also testified that he discussed resignation procedures with Mr. Tan and Mr. Haber; however, he did not discuss specific ranges for tax losses until after he formally resigned from NPR. (Tr. I at 161:5–16.)

**[FF167]**    The only evidence the Government offered to rebut Mr. Patterson's testimony was a December 17, 2001 email from Mox Tan to Mr. Haber that estimated a range of tax losses for each Taxpayer. (*See* DX162 at 1ALPHA-DISK03-017779.) However, this email was not sent to any of the Taxpayers. Moreover, Mr. Patterson testified that he had never seen this email. (Tr. I at 161:7.)

**[FF168]**    Accordingly, the Court finds that Mr. Patterson did not discuss specific ranges for tax losses until after he formally resigned from NPR.

**[FF169]**    Mr. Roach also testified that he never spoke to Mr. Tan. (Tr. II at 14:8–4.)

**[FF170]**    The Court thus finds that the email from Mr. Tan to Mr. Haber does not show that the NPR Transactions were pre-planned. There was credible testimony from Mr. Patterson that he never discussed specific ranges of tax losses until after the Taxpayers had withdrawn from NPR.

**[FF171]**    Based on the longstanding and lock-step relationship that the Taxpayers shared with one another, it was reasonable that Mr. Patterson and Mr. Nix wanted to withdraw from the NPR Investments when Mr. Roach felt forced to withdraw. (Tr. II at 52:2–17 (Nix).)

**[FF172]**    Based on the record at trial, the Court finds that Mr. Roach's reason for withdrawing from NPR Investments both credible and reasonable.

**[FF173]**    Based on the record at trial, the Court also finds that Mr. Roach's failure to secure some other means of funding instead of withdrawing from NPR Investments—such as an additional bank loan or a loan from Mr. Patterson or Mr. Nix—was not unreasonable. (Tr. II at

34:17–35:4 (Roach).) Mr. Roach was already four and a half million dollars in debt from his divorce settlement and he did not want to incur additional debt when he could withdraw from the investment to secure immediate funds. (*Id.* at 34:20–21.)

[**FF174**]    Based on the record at trial, the Court finds that the Taxpayers withdrew from NPR Investments because Mr. Roach's personal situation necessitated that he withdraw, and his two partners, Mr. Nix and Mr. Patterson, followed suit, which was consistent with their unified conduct throughout this process.

[**FF175**]    Following the Taxpayers' exit from the NPR partnership, Mr. Cohen advised the Taxpayers that for ease of administration, the foreign currencies should be contributed to the Law Firm. (Tr. I at 103:18–25 (Patterson), 222:15–223:8 (Roach); Joint Ex. A at Tr. 157:1–58:1 (Cohen).)

[**FF176**]    The Taxpayers each contributed the foreign currencies to the Law Firm. (Dkt. No. 40-1 at 24 (Stipulation of Facts from *NPR* Proceeding).)

[**FF177**]    Just as they had relied on Mr. Cohen to advise them on the NPR Investments transaction, the Taxpayers relied on and followed Mr. Cohen's advice to contribute the foreign currencies received in liquidation of the membership interests to the Law Firm. (Tr. I at 103:18–25 (Patterson), 222:15–223:8 (Roach), 231:22–232:15 (Roach); Joint Ex. A at Tr. 157:16–158:1 (Cohen).)

[**FF178**]    Mr. Patterson testified that it was not unusual for the Law Firm to hold investments because of the Law Firm's contingency work which often created uneven cash flows. (Tr. I at 104:1–24 (Patterson).)

**[FF179]**    The Taxpayers had Mr. Cohen monitor the value of the foreign currencies that were held by the Law Firm, and he advised the Taxpayers when to sell. (Tr. I at 104:17–24 (Patterson), 222:19–223:24 (Roach); Joint Ex. A at Tr. 158:2–10 (Cohen).)

**[FF180]**    Mr. Cohen advised against selling the foreign currencies quickly or all at one time because the exchange rates fluctuated. (Tr. I at 104:17–21 (Patterson), 223:19-24 (Roach).) Rather, Mr. Cohen recommended that the Taxpayers ladder the sale of the foreign currencies, and that is how they were sold. (Tr. I at 223:19–24 (Roach).)

**[FF181]**    The Partners followed and relied on Mr. Cohen's advice in deciding when and how the Law Firm should sell the foreign currency. (Tr. I at 112:22–114:7 (Patterson), 231:25–232:14 (Roach); Tr. II at 56:7–11 (Nix); Joint Ex. A at Tr. 157:24–158:16 (Cohen).)

**J.**    **Tax Advice**

**[FF182]**    As previously stipulated by the Parties:

As stated previously, when the Taxpayers withdrew from NPR, they received cash and foreign currencies representing the fair market value of their interests in NPR as of December 18, 2001. (P–Exh. 26 at PC06320; P–Exh. 27 at NPR002189; P–Exh. 28 at NPR002021; Tr. 1 at 71–73, 248–49; Tr. II at 25–26.) In their tax returns, the Taxpayers claimed that Section 752 allowed them to increase their tax basis in NPR by the premiums on the contributed long options but did not require them to reduce that basis by the amount they might have to pay on the contributed short options. The foreign currencies received by the Taxpayers upon withdrawal from NPR had a basis materially distinct from their value, and the basis was determined by what the Taxpayers paid for the long option position, while ignoring what the Taxpayers were paid for the short option position. (*See, e.g.,* P–Exh. 6.)

After reviewing the Sidley Austin opinions, Cohen concluded that the opinions "had cited the important areas where there might be potential controversy and had adequately dealt with them to [his] satisfaction that [the Taxpayers] would be okay." (Tr. I at 160–61.) Accordingly, Cohen advised the Taxpayers that they could rely on the opinions because Sidley Austin was a "very well known firm," because the opinions were "very, very well reasoned," and because Ruble was an "acknowledged partnership tax expert." (*Id.*)

(Dkt. No. 40-1 at 7 (Joint Stipulation of Facts from *NPR* Proceeding).)

**[FF183]**    The Taxpayers relied on both Pollans & Cohen and Sidley Austin in determining the proper tax treatment of their investments. (Tr. I at 110:22–111:3 (Patterson), 232:16–233:3 (Roach), Tr. II at 52:24–53:25 (Nix), 52:54:25–55:7 (Nix).)

**[FF184]**    The Taxpayers had experience looking for tax advice because the Law Firm had a history of hiring its own tax advisors, including their long-standing relationship with Pollans & Cohen. (Tr. I at 50:13–25 (Patterson).)

### 1.    <u>Sidley Austin</u>

**[FF185]**    On or around March 2, 2002, the Taxpayers each obtained a thorough, written opinion from Sidley Austin that detailed the proper tax treatment of their investments (hereinafter, the "Sidley Opinion" or collectively, "the Sidley Opinions"). (Tr. I at 105:11-21 (Patterson), 224:8–15 (Roach); Tr. II at 22:22–23:9 (Roach), 54:4–16 (Nix); *see also* PX17 (Nix's Letter), PX18 (Patterson's Letter), PX19 (Roach's Letter).)

**[FF186]**    In drafting the Sidley Opinions, Sidley Austin relied on written representations made by each of the Taxpayers. (Tr. I at 106:9–108:1 (Patterson); Tr. I at 226:6–18 (Roach); Tr. II at 70:20–71:11 (Nix); *see also* PX20, PX21, PX22.)

**[FF187]**    Mr. Patterson testified that he went through each representation line-by-line with Mr. Cohen to make sure he understood what he was representing. (Tr. I at 106:9–108.) Mr. Patterson further testified that he believed these representations to be true at the time they were made, and he continues to believe them to be true.  (Tr. I at 107:20–108:1.)

**[FF188]**    Mr. Roach also testified that he believed these representations to be true at the time they were made, and he continues to believe them to be true. (Tr. I at 226:14–18.)

**[FF189]**    The Taxpayers each signed a document—separate from the Sidley Opinion—that contained the representations referenced in the Sidley Opinion. (*See* PX20, PX21, PX22.) These three signed documents were sent to R.J. Ruble on March 28, 2002. (*See id.*)

**[FF190]**    Mr. Roach testified that these representations were sent ahead of time for the Taxpayers to review. (Tr. II at 24:24–26:3, 26:7–14, 27:5–9 (Roach)).

**[FF191]**    The fact that the signed representations were dated after the date(s) of the Sidley Opinions was merely a matter of form and not substance and does not overcome the direct testimony of the Taxpayers that their signed representations were given and received prior to the issuance of the Sidley Opinions. (*See id.*) The record is silent as to any malicious or suspicious intent on behalf of the Taxpayers as to the timing of these signed representations.

**[FF192]**    The Sidley Opinions addressed all of the relevant tax issues relating to these transactions and concluded that the proposed tax treatment was more likely than not correct. (Joint Ex. A at Tr. 159:5–161:13 (Cohen); *see also* PX17 (Nix), PX18 (Patterson), PX19 (Roach).) These opinions, which span 127 pages, were addressed to each of the Taxpayers and are dated March 6, 2002. (PX17 (Nix), PX18 (Patterson), PX19(Roach).)

**[FF193]**    The Sidley Opinions specifically addressed the "[a]pplication of Code Section 6662." (*See, e.g.*, PX17 at NPR003630–3636.) The Sidley Opinions concluded that (1) "a basis overstatement arising from issues of law, such as the Transactions, should not be the type of overstatement intended to be reached by Code Section 6662(e)(1)(A)" (PX17 at NPR003634); and (2) the IRS would not be successful if it were to attempt to impose a penalty under Code Section 6662(b)(2) or (3). (*See* PX17 at NPR003636.)

**[FF194]**    One of the technical tax issues addressed in the Sidley Opinions was whether the short option in each option pair should be treated as a liability for purposes of Section 752.

(*See, e.g.*, PX17 at NPR 003546–003558.) The Sidley Opinions explained that it was more likely than not that the short options were not liabilities for purposes of that section. (*See, e.g.*, PX17 at NPR 003554.) That opinion was based, in part, on several cases in which the IRS had successfully argued that contingent obligations did not constitute liabilities within the meaning of Section 752. (*See, e.g.*, PX17 at NPR 003546–003554.)[5]

**[FF195]**    Each of the Taxpayers reviewed the Sidley Opinions, both individually and with Mr. Cohen. (Joint Ex. A at Tr. 159:18–160:8 (Cohen); *see also* Tr. I at 109:24–111:8 (Patterson), 208:5–209:13 (Roach); Tr. II at 54:4–19, 63:20–7, 66:25–3 (Nix).)

**[FF196]**    Mr. Patterson testified that he went through the Sidley Opinion "page-by-page" with Mr. Cohen and discussed the reasoning behind the opinions before forming his belief that the opinion was both correct and accurate. (Tr. I at 110:8–17.)

**[FF197]**    Mr. Roach likewise testified that he went through the draft tax opinion with Mr. Cohen and discussed both the case citations as well as the tax concepts. (Tr. I at 208:5–209:13.) Mr. Roach noted that the opinion outlined the tax concepts, discussed the case law related to those concepts (both favorable and non-favorable), applied the relevant facts to the case law, and distinguished the relevant facts from the case law. (Tr. I at 206:14–207:3.) Mr. Roach further noted that the opinion also addressed the statutes and regulations and applied a statutory construction analysis. (Tr. I at 207:4–10.) Based on all of this, he reasonably believed that he could rely on the Sidley Opinion. (Tr. I at 209:8–13.)

---

[5] Taxpayers' counsel argued during the bench trial that internal IRS documents —PX55 and PX57—"show that the IRS, back at the relevant time frame, interpreted Section 752 to work the same way that the taxpayers  -- or the partners' tax advisors interpreted it to work and that they thought those rules would have to be changed to -- to change that result." (Tr. II at 133:3–134:9.) Plaintiffs' counsel further argued this information was "relevant to the objective reasonableness of the advice the taxpayers received." (*Id.* at 133:24–134:4.)

**[FF198]**    The Taxpayers also understood that the Sidley Opinions addressed Notice 2000-44 and concluded that it was simply a position that the IRS was taking. (Tr. I at 111:25–112:6 (Patterson); Tr. I at 207:11–22, 225:5–226:5 (Roach); Tr. II at 54:15–19 (Nix); *see, e.g.*, PX17 at NPR 003603–607.)

**[FF199]**    Mr. Roach asked Mr. Cohen if any Fifth Circuit case law addressed the issues in the Sidley Opinion, and Mr. Cohen provided him with a recent Fifth Circuit case that was on the issue of expectation of profits. (Tr. I at 208:5–209:2.)

**[FF200]**    Based on the record at trial, the Court finds that the Taxpayers' reliance on the Sidley Opinions was reasonable and in good faith.

## 2. *Daugerdas* Opinion

**[FF201]**    Sometime around March 2001,[6] R.J. Ruble was identified in the background section of an opinion issued by the United States Court for the Southern District of New York as follows:

> DGI asserts that the OPS [Optional Partnership Strategy] originated sometime in 1998 during a conversation between Orrin Tilevitz, an attorney, who at the time was an employee of Price Waterhouse LLP engaged by DGI to review and develop strategies, and R.J. Ruble, a lawyer with the firm of Brown & Wood LLP. According to Haber, DGI spent 'hundreds of hours of professional time' developing the OPS into a functional tax strategy.'

(*See* DX103, *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 450–51 (S.D.N.Y. 2001) (hereinafter, "Daugerdas Opinion").)

**[FF202]**    There is no other mention of R.J. Ruble in the Daugerdas Opinion. *See id.*

---

[6] The Government presented no evidence of when this opinion was published so the Court has no way of knowing precisely when this opinion was published and can only assume it came sometime after the date on the face of the opinion—March 22, 2001.

**[FF203]**    The Taxpayers all testified that they were not aware of the Daugerdas Opinion prior to entering into NPR Investments. (Tr. I at 155:8–157:8 (Patterson), 184:1–6 (Roach); Tr. II at 20:22–21:10 (Patterson), 65:9–66:3 (Nix).)

**[FF204]**    None of the Taxpayers conducted a Westlaw or Lexis search of Mr. Ruble or Diversified based on Mr. Patterson's discussion with Mr. Ruble regarding his potential conflict-of-interest or any representations made by Mr. Ruble or Diversified. (Tr. I at 93:11–16, 155:16–156:7 (Patterson); Tr. I at 181:7–182:3 (Roach); Tr. II at 65:3–8 (Nix).)

**[FF205]**    The Taxpayers all testified that they did not conduct any form of search on either Lexis or Westlaw in an attempt to locate the Daugerdas Opinion. (Trial Tr. at 93:11–16 (Patterson), 155:8–157:8 (Patterson), 184:1–6 (Roach); Tr. II at 20:22–21:10 (Patterson), 65:9–66:3 (Nix).)

**[FF206]**    That the Taxpayers did not conduct a Lexis or Westlaw search was not out of the ordinary because none of the Taxpayers regularly used Westlaw or Lexis in either their daily legal practice or to perform background research before hiring a professional advisor. (Tr. I at 93:11–16 (Patterson); Tr. I at 181:7–182:3 (Roach); Tr. II at 65:3–8 (Nix).)

**[FF207]**    The Taxpayers all testified that they did not conduct any other form of independent investigation into the connection R.J. Ruble had with DGI or any potential relationship that would raise doubts as to his independence. (Trial Tr. at 93:11–16 (Patterson), 155:8–157:8 (Patterson), 184:1–6 (Roach); Tr. II at 20:22–21:10 (Patterson), 65:9–66:3 (Nix).)

**[FF208]**    The Taxpayers each believed, based on Mr. Patterson's questioning of Mr. Ruble, that Mr. Ruble had their best interest and was free of conflict to represent them with Sidley Austin. (Tr. I at 91:16–92:19 (Patterson), 184:12–185:14 (Roach); Tr. II. at 61:2–8 (Nix).)

43

**[FF209]**    The Government did not present any expert testimony that the Taxpayers should have searched for, found, or seen the Daugerdas Opinion.

**[FF210]**    The Government did not present any expert testimony that the Taxpayers should have conducted a further search regarding R.J. Ruble, including a Lexis or Westlaw search.

**[FF211]**    The Government did not provide any evidence that conducting searches on either Westlaw or Lexis before hiring a professional advisor was reasonable or necessary.

**[FF212]**    The Government did not present any testimony, via expert or otherwise, that the Taxpayers should have understood from the Daugerdas Opinion that Mr. Ruble was a known tax promoter.

**[FF213]**    The Court finds that the weight of the evidence shows that the Taxpayers neither had nor should have had knowledge of the Daugerdas Opinion prior to entering the NPR Transactions.

**[FF214]**    The Court finds, based on the Taxpayers' history of not conducting Lexis or Westlaw searches in either their practice of law or when choosing tax advisors, that it was not unreasonable that the Taxpayers did not conduct a search of R.J. Ruble.

**[FF215]**    Based on the record at trial, the Court finds that the Taxpayers did not know that Mr. Ruble was a "known promoter of a tax scheme" when he was giving them tax advice.

**[FF216]**    Even if the Taxpayers had seen or should have seen the Daugerdas Opinion, which the Court does not find, the Court further finds that the Daugerdas Opinion does not identify R.J. Ruble as a "known promoter of a tax scheme" as the Government argues. Rather, the Daugerdas Opinion briefly mentions R.J. Ruble as an attorney, who along with another attorney (who is not involved in this case whatsoever), developed a "functional tax strategy." The only mention of R.J. Ruble is in the background section, and the statement is framed as an assertion by

the Defendant Diversified Group, Inc. (*See* DX103.) It is not a factual finding or conclusion made by the court. (*See* DX103.)

### 3.    **Pollans & Cohen**

**[FF217]**    Mr. Cohen testified that he relied on R.J. Ruble and his tax opinion to advise the Taxpayers on how to properly report the NPR transaction. (Joint Ex. A Tr. at 145:13–146:10, 146:20–147:5, 147:23–148:7, 157:16–158:4, 158:17–159:10, 161:2– 161:13, 177:4–10.)

**[FF218]**    Mr. Cohen testified that he prepared both the Taxpayers' individual returns and the Law Firm's partnership return. (Joint Ex. A Tr. at 158:17–159:1 (2001 Partnership Tax Return), 162:19–163:2 (2001 Roach Individual Tax Return), 163:12–19 (2002 Partnership Tax Return), 165:7–167:5 (2002 Patterson, Roach, and Nix Individual Tax Returns).) He recommended to the Taxpayers before signing and filing their returns that they should report the sales of the foreign currencies they received when they resigned from NPR on the basis recommended in the Sidley Opinions. (Joint Ex. A at Tr. 161:2–13, 166:6–23 (Cohen); *see also* PX17, PX18, PX19.)

**[FF219]**    The Taxpayers testified that they separately relied on both Mr. Cohen and Sidley Austin for tax advice when filing their returns. (Tr. I at 113:21–24, 124:8–14 (Patterson); Tr. I at 224:4–7, 231:16–18, 231:22–233:2 (Roach); Tr. II 53:7–25, 54:25–55:4 (Nix).)

**[FF220]**    The Taxpayers testified that they believed they could reasonably rely on this advice. (Tr. I at 112:12–113:20, 124:8–14 (Patterson); Tr. I at 209:5–13, 224:20–225:4 (Roach); Tr. II 53:12–14, 55:5–6 (Nix).)

**[FF221]**    Mr. Patterson testified that he did not know Mr. Cohen received a fee from Diversified until trial preparation began for the partnership-level proceedings. (Tr. I at 114:8– 115:7.)

**[FF222]**    Mr. Roach testified that he did not know Mr. Cohen received a fee from Diversified until trial preparation began for the partnership-level proceedings. (Tr. I at 227:5–229:16.)

**[FF223]**    Mr. Nix also testified that he did not know Mr. Cohen received a fee from Diversified until trial preparation began for the partnership-level proceedings. (Tr. II at 72:9–16.)

**[FF224]**    The fact that the Taxpayers did not sue Mr. Cohen for breach of fiduciary duty does not case doubt upon their credible testimony that they did not know Mr. Cohen had a conflict-of-interest while he was advising them. (Tr. I at 163:25–164:14 (Patterson); Tr. II at 9:25–10:5 (Roach), 10:16–11:7 (Roach), 72:17–73:1 (Nix).)

**[FF225]**    Based on the record at trial, the Court finds that Pollans & Cohen's role in advising the Taxpayers went well beyond that of merely setting up meetings with Sidley Austin. Pollans & Cohen were directly involved in investigating the Sidley Opinions, and they closely followed the implementation and tax reporting that followed the issuance of the Sidley Opinions. Further, the Court finds that Pollans & Cohen independently reviewed the Sidley Opinions with the Taxpayers, independently reviewed IRS Notice 2000-44, and independently advised the Taxpayers on tax reporting and the proper treatment of the underlying transactions.

**[FF226]**    By way of example, Mr. Cohen reviewed the transaction for its profit potential, reviewing historical pricing data, to ensure that the investment met the goals of his clients, and he reviewed the profitability outlines in detail with them. He advised them that the NPR transaction was risky but had the potential to create substantial profit. After negotiating the option terms, Mr. Cohen continued to advise and review the performance of the investments. Following the Taxpayers' decision to withdraw, Mr. Cohen continued to monitor the performance of the foreign

currencies held by the Law Firm. The Taxpayers also provided him with all relevant information, most of which he would have been aware of through his own extensive involvement.

**[FF227]**   The Court finds that Mr. Cohen reviewed the Sidley Austin opinions, confirming that all the facts that the opinions relied on were correct. For example, Mr. Cohen reviewed all the legal authority in the opinions, checking the citations and the reasoning to verify it made sense to him. (Joint Ex A at Tr. 148:8–18, 160:18–161:1.) Mr. Cohen also provided Mr. Roach with additional case law from the Fifth Circuit. (Tr. I at 206:12–9:208:22 (Roach).)

**[FF228]**   The Parties have further stipulated that "[a]fter reviewing the Sidley Austin opinions, Cohen concluded that the opinions 'had cited the important areas where there might be potential controversy and had adequately dealt with them to [his] satisfaction that [the Taxpayers] would be okay.'" (Dkt. No. 40-1 at 7 24 ("Stipulated Facts from NPR Proceedings").)

**[FF229]**   Based on the record at trial, the Court finds that Pollans & Cohen gave the Taxpayers tax advice, and the Taxpayers relied on that tax advice.

**[FF230]**   Based on the record at trial, the Court further finds that the Taxpayers did not know that Mr. Cohen had a conflict of interest when he was advising them on the NPR Transactions.

### 4.    IRS Notice 2000-44[7]

**[FF231]**   The Sidley Opinions also addressed IRS Notice 2000-44. (*See, e.g.*, PX17 at NPR 003603–003607.)

**[FF232]**   The Sidley Opinions concluded that "[i]t is more likely than not that the authorities cited in Notice 2000-44 would not provide a basis for denying the deduction of a loss sustained from the Transactions." (*See, e.g.*, PX17 at NPR 003607.)

---

[7] Despite the Government's reliance on the IRS Notice 2000-44, the Government did not move to admit it into evidence.

[**FF233**]    Mr. Cohen also reviewed Notice 2000-44 and discussed its potential application to the NPR Transactions. Joint Ex. A at Tr. 167:6–19 (Cohen). Mr. Cohen informed the Taxpayers that he did not believe that Notice 2000-44 applied to the NPR transaction. (Joint Ex. A at Tr. 168:19–21 (Cohen); *see also* Tr. I at 111:25–112:11 (Patterson), 225:20–226:5 (Roach), 232:16–233:2 (Roach).)

[**FF234**]    Mr. Roach reviewed Mr. Ruble's opinion regarding the 2000-44 Notice. (Tr. I at 207:11–22 ("What I remember in the discussion was that it was Mr. Ruble's opinion that the 2000-44 notice, number one, is – is simply a position that the IRS is taking. It is not the law. And so it has to be tested. And then, secondly, he did an analysis of that notice, and it was his conclusion that the 2000-44 notice was wrong. And he explained why in – in the – in the opinion.").)

[**FF235**]    Mr. Cohen's opinion differed slightly from Mr. Ruble's opinion in that Mr. Cohen believed the Notice did not apply to the underlying transactions to where as Mr. Ruble opined that the IRS' position in the Notice was wrong. (*See* Tr. I at 232:20–25.)

[**FF236**]    Based on the record before the Court, the Taxpayers' belief that Notice 2000-44 was not applicable to the NPR Transactions was reasonable in light of the advice they received from both Sidley Austin and Pollans & Cohen.

### K.    Tax Reporting

[**FF237**]    Between 2001 and 2003, the Law Firm disposed of the foreign currencies that the Taxpayers had contributed to it. (PX3 (2001 Partnership Tax Return); PX4 (2002 Partnership Tax Return); PX5 (2003 Partnership Tax Return); *see also* Tr. I at 118:4–121:24 (Patterson).)

[**FF238**]    All gains or losses from the foreign currencies were specially allocated to the respective contributing partner on the Law Firm's books and on the tax returns, although only the dollar amounts of losses, not the currencies or the currency transactions, were identified. (Dkt. No.

40-1 at 24 (Stipulation of Facts from NPR Proceeding).) On the Law Firm's tax returns, the losses were identified under a heading "Business Risk Division." (*Id.*; *see also* PX3 (2001 Partnership Tax Return); PX4 (2002 Partnership Tax Return); PX5 (2003 Partnership Tax Return).)

**[FF239]**   The Taxpayers treated their individual basis in NPR Investment as the premiums on the long options, ignoring the amount they might have to pay on the short options. This basis was carried over to the foreign currency after distribution, which was used by the Taxpayers to calculate approximately $65,000,000 in tax losses once the foreign currencies were sold. (Dkt. No. 40-1 at 24 (Stipulation of Facts from *NPR* Proceeding).)

**[FF240]**   Mr. Nix's and Mr. Patterson's actual investment in NPR Investments was $625,000 and Roach's was $375,000, but Mr. Nix and Mr. Patterson each claimed an outside basis in the long options of almost $25,000,000, and Roach claimed an outside basis of almost $15,000,000. (*Id.*)

**[FF241]**   Only a small amount of the foreign currencies was disposed of in 2001, which resulted in a $1,645,612 foreign currency loss that was passed through from the Law Firm's Form 1065 partnership return to Mr. Roach's individual return. (*See* PX3 at DOJ-001072; *see also* Tr. I at 118:15–119:16 (Patterson).)

**[FF242]**   The majority of the foreign currencies were disposed of in 2002, which resulted in a foreign currency loss that was passed through from the Law Firm's Form 1065 partnership return to the Partners' individual returns as follows: a $12,942,103 loss to Mr. Nix; a $13,484,452 loss to Mr. Patterson; and a $6,847,687 loss to Mr. Roach. (*See* PX4 at NPR-IRS-Add-Disc-3141, 3149–3150; *see also* Tr. I at 119:20–120:24 (Patterson).)

**[FF243]**   The Law Firm reported the losses from the sale of foreign currency in a separate line item on a statement attached to each of the returns. (*See* PX3, PX4, PX5.)  The front page of

49

each of the returns directed the reader to this separate schedule, which broke out the loss for the foreign currency transactions under the heading "Business Risk Division". (*See, e.g.*, PX4 at NPR-IRS-AddDic-3141.)

**[FF244]**    Mr. Cohen prepared this statement as a way of separating the losses from the Law Firm's other activities. (Joint Ex. A at Tr. 187:5–188:9 (Cohen).)

**[FF245]**    The Law Firm's in-house accountant, Mr. Steve. Johnston, testified that the "Business Risk Division" on the 2001 and 2002 Partnership Tax Returns was "a way of isolating the transaction from the general operations of the Law Firm." (Tr. II at 43:5–44:21, 45;11–17.) Mr. Johnston further testified that Mr. Cohen never gave any indication that this reporting was done with an intent to hide the transaction from the IRS. (Tr. II at 44:25–45:17 (Johnston); *see also* Joint Ex. A at Tr. 163:12–164:16 (Cohen).)

**[FF246]**    Mr. Johnston also testified that there was no "Business Risk Division" in the Law Firm in 2001, 2002, or 2003. (Tr. II at 44:16–17, 46:1–12.)

**[FF247]**    Plaintiffs' expert, Mr. Fred Murray, found that the Law Firm's 2001, 2002, and 2003 Partnership Tax Returns did not have the effect of hiding the foreign currency transactions from the IRS. (Tr. II at 116:8–13 (2001 Report), 119:17–24 (2002 Report), 121:16–22 (2003 Report).) The Court agrees.

**[FF248]**    For example, he explained that the Law Firm's reporting of the sale of the NPR transactions for the 2001, 2002, and 2003 Forms 1065 disclosed the transaction to the IRS. (Tr. II at 116:10–13, 119:17–21, 121:16–22.) Mr. Murray identified several items on the Forms 1065 that would be helpful to the IRS in identifying the tax effects of the transaction: the separate schedule stating the losses from the foreign currency that was referenced on the first page of the tax return

on Line 1a, Schedule L, Statement 8 to Schedule L, Schedule M-2, and the disclosure statements. (Tr. II at 116:19–119:16, 120:3–21, 121:2–15.)

[FF249]    Mr. Murray acknowledged that the Law Firm's reporting may have been inconsistent with the instructions for the Form 1065, but the Law Firm's method of reporting likely provided the IRS with more information than was required by the instructions. (Tr. II at 123:22–124:9, 130:2–11.)

[FF250]    For example, Mr. Murray testified that the foreign currency loss should have been referenced directly on the Schedule K and Schedule K-1. (Tr. II at 123:12–124:9, 131:2–14.) Instead, the Law Firm reported both items on a separate schedule and carried the net amount to the front page of the return, which instructed the reader to turn to the separate schedule. (*See, e.g.*, Tr. II at 116:16–117:14; *compare* PX3 at DOJ-001061 (disclosing $11,698,809 as "Gross Receipts or sales" on Line 1a), *with* PX3 at DOJ-001072 (separate schedule breaking down the $11,698,809).)

[FF251]    While Mr. Murray testified that the IRS would have to do an audit to determine the losses attributable to the Business Risk Division, he also testified that there are "probably lots of other transactions [on the Partnership Return] that [were] no more carefully delineated." (Tr. II at 124:24–125:3.)

[FF252]    The Law Firm's 2002 and 2003 Form 1065 Partnership Returns not only contained the separate schedule with the "Business Risk Division," but it also contained a separate disclosure statement, which detailed the Taxpayers' foreign currency transactions and identified them as a "Digital Option Investment Strategy" or "Son of Boss." (*See, e.g.*, PX4 at NPR-IRS-AddDisc-3141 (schedule showing the "Business Risk Division), NPR-IRS-AddDisc-3149–3150 ("Disclosure Statement for Reportable Transaction").)

51

[FF253]    The Taxpayers also filed these disclosure statements with their individual 2002 tax returns.[8] (*See* PX8 at NPR 001143–46 (Nix); PX12 at PO1277–80 (Patterson); PX15 at NPR 000336–37 (Roach).) The Taxpayers also sent these disclosure statements to the Office of Tax Shelter Analysis, which is a specific office within the IRS created to assist with enforcement efforts related to reportable transactions. (Tr. II at 120:14–21 (Murray); PX49.)

[FF254]    These disclosure statements provided a complete recitation of the major features of the investments even though the Taxpayers were advised that they were not technically required to file the disclosure statements. (Joint Ex. A at Tr. 164:11–22 (Cohen); Tr. I at 120:10–121:2, 123:1–7, 124:15–125:24 (Patterson); Tr. II 120:4–21 (Murray).)

[FF255]    In addition to providing detailed descriptions of the Taxpayers' investments, these statements informed the IRS that the "[p]rincipal tax benefits of the transaction[s]" were that the Law Firm "recognized foreign currency losses upon its disposition of nonfunctional foreign currency," provided estimates of the "expected reduction of federal income tax liability" for each of the Taxpayers, and identified Diversified as the entity that "promoted, solicited, or recommended" the investments. (Tr. II 120:4–21 (Murray); *see, e.g.*, PX4 at NPR-IRS-AddDisc-3149–50.)

[FF256]    Mr. Murray testified that this separate disclosure "identifies the transaction, describes it, talks about the tax benefits that are involved, and even allocates the benefits among the respective partners. It is essentially . . . most of what the Internal Revenue Service would want to know about a transaction if it were -- wanted to review it as -- as a reportable transaction." (Tr. II at 120:4–21.)

---

[8] The Taxpayers did not include any disclosure statement with their 2003 individual returns because they did not claim the foreign currency losses that the Law Firm allocated to them that year.

**[FF257]**    The Law Firm disposed of the remaining foreign currency in 2003. (Joint Ex. A at Tr. 201:17–20 (Cohen); *see also* Tr. II at 126:1–16 (Patterson); Tr. II at 16–22 (Murray).) The foreign currency losses resulting from the disposition were passed through from the Law Firm's 1065 Partnership Tax Return to the Taxpayers' individual returns. (*See* PX5 at NPR-IRS-AddDisc-3167, 3174–3176.)

**[FF258]**    Unlike 2001 and 2002, however, the Taxpayers did not claim any foreign currency losses; instead, they notified the IRS that their returns would be inconsistent with the return filed by the Law Firm. (Tr. I at 126:1–127:1 (Patterson).) The Taxpayers thought it was proper to not claim the 2003 losses, but instead amend their 2003 returns to make protective refund claims for the 2003 losses. (Tr. I at 126:1–127:1 (Patterson).)

**[FF259]**    Like 2001 and 2002, the Law Firm also included the disclosure statement on its 2003 Form 1065 Partnership Tax Return. (*See* PX5 at NPR-IRS-AddDisc-3167,3174–3176; *see also* 126:25–127:3 (Patterson).)

**[FF260]**    Mr. Murray testified that certain amendments to the disclosure for listed transaction requirements under Section 6011 regulations were expanded for the 2002 tax return year, which applied to individuals and partnerships. (Trial Tr. II at 126:17–127:11.) He further testified that it is questionable as to whether the NPR Investments transaction fell under these amendments because there were "significant changes to a number of these rules over the period from 2000 to 2004," which created multiple questions as to how the rules were to be applied. (Tr. II at 126:17–127:21.)

**[FF261]**    On September 4, 2001, Mr. Patterson timely filed his 2000 individual tax return. (DX269 at 000375; s*ee generally* PX10.)[9] On October 3, 2002, Mr. Patterson timely filed his 2001

---

[9] The Court takes judicial notice of the following individual tax returns: PX6, PX7, PX9, PX10, PX11, PX13.

individual tax return. (DX269 at 000385; *see generally* PX11.) On October 16, 2003, Mr. Patterson timely filed his 2002 individual tax return. (DX269 at 000393; *see generally* PX12.) On or about October 13, 2004, Mr. Patterson timely filed his 2003 individual tax return. (*See generally* PX13.)

[**FF262**]     Mr. Patterson reported losses on sales of foreign currency that he received from the Klamath and Kinabalu partnerships, respectively, on both his 2000 and 2001 returns. (*See* Tr. I at 133:24–134:11) The Law Firm did not sell any of the foreign currencies that it received from Mr. Patterson with respect to NPR in 2001, so neither his 2000 nor his 2001 returns reflected losses from that transaction. (Tr. I at 121:25–122:3; *see also* PX49.)

[**FF263**]     On October 13, 2001, Mr. Nix timely filed his 2000 individual tax return. (DX271 at 000346; *see generally* PX6.) On October 17, 2002, Mr. Nix timely filed his 2001 individual tax return. (DX271 at 000355; *see generally* PX7.) On October 16, 2003, Mr. Nix timely filed his 2002 individual tax return. (DX271 at 000362; *see generally* PX8.) On October 18, 2004, Mr. Nix timely filed his 2003 individual tax return. (DX271 at 000368; *see generally* PX9.)

[**FF264**]     Mr. Nix reported losses on sales of foreign currency that he received from the Klamath and Kinabalu partnerships, respectively, on both his 2000 and 2001 returns. (*See* Tr. II at 57:20–25.) The Law Firm did not sell any of the foreign currencies that it received from Mr. Nix with respect to NPR in 2001, so neither his 2000 nor his 2001 returns reflected losses from that transaction. (Tr. I at 121:25–122:3; *see also* PX49.)

[**FF265**]     On August 18, 2002, Mr. Roach timely filed his 2001 individual tax return. (DX273 at 000401; *see generally* PX14.) On October 17, 2003, Mr. Roach timely filed his 2002 individual tax return. (DX273 at 000409; *see generally* PX15.) On or about October 13, 2004, Mr. Roach timely filed his 2003 individual tax return. (*See generally* PX16.)

**[FF266]**    On his 2001 individual tax return, Mr. Roach reported losses from the Law Firm's sale of foreign currency from NPR issued to him by the Law Firm. (*See* PX14 at NPR000238.)

**[FF267]**    On their 2002 individual tax returns, the Taxpayers reported losses from the Law Firm's sale of foreign currency from NPR issued to them by the Law Firm. (*See* PX8, PX12, PX15 at NPR00326 (Roach).)

**[FF268]**    On their 2002 individual tax returns, Mr. Patterson and Mr. Nix also reported losses from the sale of euros from the Klamath and Kinabalu transactions. (PX8, PX12.)

**[FF269]**    On their 2003 individual tax returns, the Taxpayers did not claim any losses from the Law Firm's sale of the NPR foreign currency. (Tr. I 126:1-13 (Patterson); Tr. I 229:17-230:1 (Roach).) This reporting differed from their individual Schedule K-1 issued by the Law Firm so the Taxpayers filed Forms 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request. (*See, e.g.*, PX16.)

**[FF270]**    Based on the record before the Court, the Court finds that the 2001, 2002, and 2003 Partnership Tax Returns adequately disclosed the NPR Investments transactions to the IRS.

**[FF271]**    Notwithstanding the Government's evidence and cross-examination, the weight of the evidence shows that the Taxpayers did not fail to disclose the NPR Investments to the IRS. There was no intent to hide the transaction from the IRS. To the contrary, the Court finds that although the Taxpayers did not follow the reporting instructions from the IRS *per se*, the Taxpayers' disclosure of the NPR Investments transactions gave the IRS as much or more information than it would have had had the Taxpayers followed the precise reporting instructions.

**[FF272]**    Notwithstanding the Government's evidence and cross-examination, the weight of the evidence does not support the Government's proposition that the Taxpayers merely

disclosed their NPR Investment transactions because the IRS discovered their participation in "abusive transactions" or required it by amending the transaction requirements under Section 6011 regulations.

### L.    Mr. Patterson's 2001 and 2002 IRS Assessments

[FF273]    Mr. Patterson sent copies of the amended refund claims (1) to the IRS Service Center as required by the instructions; (2) to the location required by the Notices of Computational Adjustment; and (3) to Mr. Sanchez-Garcia as a courtesy copy "to ensure the IRS is fully informed regarding these claims." (*See* PX35.) The Government did not rebut this finding.

[FF274]    The IRS originally assessed Mr. Patterson's 2001 tax liability related to both the *Klamath* and the *NPR* partnership proceedings on May 26, 2015. (*See* DX269 at 000386–000388 (showing "Quick Assessment" and "Interest Assessed" with an assessment date of May 26, 2015).)

[FF275]    Carlo Sanchez-Garcia testified as the IRS's designated 30(b)(6) witness. (Tr. II at 77:4–6.) As the revenue agent that was assigned to the Taxpayers' case, he testified that he had "control" of the Taxpayers' tax returns. (*Id.* at 84:5–6, 13–14; *see also* PX82 (referring to Mr. Sanchez Garcia as "the case agent assigned to [Mr. Patterson]").)

[FF276]    On April 4, 2016, the IRS abated the assessment of Mr. Patterson's 2001 tax liability. (Tr. II at 81:9–13 (Sanchez-Garcia); DX269 at 000388.) The IRS issued Mr. Patterson a refund check for $910,137.17. (DX269 at 000388.)

[FF277]    Mr. Patterson testified that he first contacted the IRS when he received the refund check. (Tr. I at 130:15–25.)

[FF278]    Mr. Sanchez-Garcia testified that he received an email from a representative for Mr. Patterson about the refund check. (Tr. II at 96:9–11, 97:4–10 (Sanchez-Garcia).) Mr. Sanchez-

56

Garcia told the representative that "it was a mistake." (Tr. II at 97:13–14.) At the IRS' request, Mr. Patterson returned the refund check uncashed. (Tr. II at 97:12–17 (Sanchez-Garcia).)

[FF279]    On April 11, 2016, that refund check was cancelled. (Tr. II at 81:14–19; DX269 at 000389.)

[FF280]    Mr. Sanchez-Garcia testified about email correspondence between David Lindberg (the Territory Manager), Robert Gee (the Large Business and International Individual Compliance Team Manager), and himself. (Tr. II at 85:1–9.) In the email, which contains the subject line "Erroneous Abatements Made by Campus – Corrections Needed – Refund Check Returned," Mr. Lindberg states that the case was sent "to [the] Examination CATA Classifiers at [the IRS'] campus two times," and "[b]oth times it came back as accepted as filed." (PX82 at DOJ2-0000818.) Mr. Sanchez-Garcia testified that there was no reason to believe Mr. Lindberg was being untruthful in this regard. (Tr. II at 85:3–9.)

[FF281]    In the same email correspondence, Mr. Lindberg also states that "[a]t this point, examination would have to reassess the account." (PX82 at DOJ2-0000818.)

[FF282]    When asked whether the IRS reviewed the refund claim before it decided to make that abatement, Mr. Sanchez-Garcia also testified that he was unable to find the agent or employee who reviewed the amended return. (Tr. II at 84:2–6.)

[FF283]    Mr. Sanchez-Garcia testified that the IRS reassessed that abatement on October 20, 2016. (Tr. II at 81:20–82:4; DX269 at 000388.) He later testified that although noted as "assessments," there were actually corrections "basically to just correct the amended return that was erroneously processed." (Tr. II at 98:21–99:8.)

**[FF284]**    The IRS originally assessed Mr. Patterson's 2002 tax liability related to the *NPR* partnership proceedings on May 26, 2015. (*See* DX269 at 000398 (showing a credit of $2,243,131.20 to the account); Tr. II at 99:9–100:15 (Sanchez-Garcia).)

**[FF285]**    Sometime between then and March 8, 2016, the IRS abated the 2002 penalty "with a reason code 062 'Penalty adjustment Due to Reasonable Cause.'" (PX80 at DOJ2-0000813; Tr. II at 85:23–86:6 (Sanchez-Garcia).)

**[FF286]**    No refund check was issued or processed. (Tr. II at 100:25–101:2 (Sanchez-Garcia); *compare* DX269 at 000389 (indicating "canceled refund check", *with* DX269 at 000393–000399 (no such indication).)

**[FF287]**    On May 2, 2016, the IRS "reversed" the credit to Mr. Patterson's account. (DX269 at 000397; Tr. II at 100:10–20 (Sanchez-Garcia).)

**[FF288]**    While the IRS failed to locate the employee who ultimately made that decision, the Team Manager (Justin Draper) who reviewed the case found that the employee "had somewhat of a reasonable basis to accept [the abatement request] (sans the case not being already open to [Mr. Sanchez-Garcia])." (Tr. II 85:18–96:11 (Sanchez-Garcia); PX80 at DOJ2-0000809.)

**[FF289]**    Mr. Sanchez-Garcia testified that he was working on the refund claims for the Taxpayers, including Mr. Patterson, and that the assignment caused freeze and litigation codes to be placed on the account. (Tr. II at 92:4–15.)

**[FF290]**    At trial, Mr. Sanchez-Garcia specifically identified the freeze codes on Mr. Patterson's account. (*See* Tr. II at 93:5–20, DX270.) He further testified that these freeze codes were placed on Mr. Patterson's 2001 and 2002 accounts in 2016—the time of the refunds-at-issue. (Trial Tr. II at 94:5–10.) These freeze codes are designed to alert others at the IRS that the case is controlled by someone specifically and that any changes should be discussed with that individual.

58

(Tr. II at 94:11–23 (Sanchez-Garcia).) However, an IRS employee can still gain access a taxpayer's account even if the freeze code is in place. (Tr. II at 94:18–23 (Sanchez-Garcia).)

**[FF291]**    Mr. Sanchez-Garcia testified at trial that he did not know if the IRS employee who abated Mr. Patterson's 2001 and 2002 taxes saw a litigation code. (Tr. II at 87:5–10.)

**[FF292]**    For Mr. Nix and Mr. Roach, the freeze codes operated as intended and prevented Mr. Nix and Mr. Roach's refund claims from being processed. (Tr. II at 104:11–106:13 (Sanchez-Garcia).)

**[FF293]**    Mr. Sanchez-Garcia further testified that he believed the adjustments made to Mr. Patterson's account for the 2001 and 2002 tax years were mistakes. (Tr. II at 102:24–15.)

**[FF294]**    Based on the record before the Court, the Court finds Mr. Sanchez-Garcia's testimony to be credible.

**[FF295]**    The Court further finds that the adjustments made to Mr. Patterson's account in the 2001 and 2002 tax years were corrections rather than true "assessments" regardless of how the adjustments are designated on Mr. Patterson's account.

**[FF296]**    Upon realizing that a refund or credit had been erroneously processed, Mr. Sanchez-Garcia tried to determine who at the IRS was processing the amended returns. (Tr. II at 101:3–102:15.) The freeze codes on Mr. Patterson's account were meant to prevent anyone other than Mr. Sanchez-Garcia from processing any claims. When these refund claims were erroneously processed, the Court finds that Mr. Sanchez-Garcia took appropriate steps to correct the mistakes.

**[FF297]**    The Court further finds that these processing errors were not due to a mistake by Mr. Patterson in submitting his refund claim.

### M.    Partnership-level Proceedings

**[FF298]**    On or about August 2, 2004, Mr. Roach timely filed an amended individual income tax return for tax year 2001 to conform his tax reporting to the position taken by the IRS in Notice 2000-44. (*See* PX14 at NPR000284–298.) In the first amended Form 1040X, Mr. Roach disagreed with the IRS's position in Notice 2000-44. (PX14 at NPR000286 ("Despite the filing of this Form 1040X, the taxpayer does not agree with the position taken by the IRS in Notice 2000-44.").)

**[FF299]**    On or about August 10, 2004, Mr. Roach paid the $744,009.00 taxes due. (DX273 at DOJ 6751 Supp. Disclosures 000401; *see also* PX14 at NPR000286 ("The taxpayer is filing this Form to . . . make payment (not a deposit) of the associated tax and interest.").) Mr. Roach testified that he paid the IRS under protest so that he would be allowed to file a refund claim and then, if necessary, a refund suit. (Tr. I at 236:24–237:8 (Roach).)

**[FF300]**    On or about August 16, 2004, Mr. Roach timely filed a second amended Form 1040X for tax year 2001 to claim a refund of the $744,009. (PX14 at NPR000301–315; DX273 at DOJ 6751 Supp. Disclosures 000401.) In the second amended Form 1040X, Mr. Roach again disagreed with the IRS's position in Notice 2000-44. (PX14 at NPR000301 ("The taxpayer disagrees with the position taken by the IRS in Notice 2000-44.").)

**[FF301]**    Mr. Roach filed these two claims to begin the process of bringing suit in court to challenge any of the IRS' adjustments to the NPR Partnership return.  (Tr. I at 237:2–8.)

**[FF302]**    Mr. Roach filed an amended tax return prior to the issuance of the FPAA, in part as a method to seek expedient judicial review of the propriety of NPR's tax reporting position. (Tr. I at 237:2-8 (Roach).)

**[FF303]**   The IRS issued the Notices[10] to the individual Taxpayers as follows:

- Nix: Affected Item Notices of Deficiency for the tax years 2000, 2001, 2002, and 2003; Notices of Computational Adjustment for the tax years 2000 and 2001. (PX37.)

- Patterson: Affected Item Notices of Deficiency for the tax years 2000, 2001, and 2002; Notices of Computational Adjustment for the tax year 2001 (PX38; *see also* Dkt. No. 76 at ¶ 22.)

- Roach: Affected Item Notices of Deficiency for the tax years 2001 and 2002; Notices of Computational Adjustment for the tax year 2001 (PX39; *see also* Dkt. No. 77 at ¶ 19.)

**[FF304]**   These Notices imposed accuracy related penalties for substantial understatement under 26 U.S.C. § 6662(d) and gross valuation misstatement under 26 U.S.C. § 6662(e) and (h). (*See, e.g.*, PX37 at NPR2018-000018.)

**[FF305]**   In its Notices, the IRS disallowed Mr. Roach's losses in the foreign currency that he sold in 2001 and 2002. (*See* PX39-A at NPR2018-000315.)

**[FF306]**   Throughout the audit process of Klamath Transaction and the NPR Investments, the Taxpayers testified that they cooperated with all reasonable requests by the IRS for information related to the partnerships and their individual returns, providing information and documents and not withholding any non-privileged documents. (Tr. I at 65:16–23 (Patterson); Tr. I at 235:25–236:19 (Roach); Tr. II at 56:12-21 (Nix); PX24, PX25, PX26, PX27, PX90.) The Government offered no evidence to rebut this testimony. (*See generally* Tr. I; Tr. II.)

---

[10] The Court takes judicial notice of PX37 and PX39.

**[FF307]**    Mr. Patterson and Mr. Nix testified that they believed the reporting position at issue in Klamath was defensible throughout the litigation. (Tr. I at 67:1–23 (Patterson); Tr. II 56:22–57:5 (Nix).)

**[FF308]**    Mr. Patterson and Mr. Nix were unaware that the loan proceeds could not be used for the intended investments until the end of the Klamath trial. (Tr. I at 67:9-14 (Patterson) ("Q: You said the transaction was disallowed. Do you recall why the transaction was disallowed? A: Yes, sir. Unknowing to Harold and I, the Presidio and the banks had a side agreement that actually did not make the transaction work. Q: When did you first learn about those agreements between Presidio and the bank? A: At the end of the trial.").)

**[FF309]**    Klamath and Kinabalu challenged the IRS adjustments in the Eastern District of Texas and were consolidated for trial into the lead Klamath case. *See* FF6–7.

**[FF310]**    NPR also challenged the IRS adjustments in the Eastern District of Texas. *See* FF8–11.

**[FF311]**    The Parties "stipulated that [Taxpayers] were reasonable in their 'response to opportunities afforded to [them] to settle the transaction[s]' and attempted to settle the transactions at issue in good faith." (Dkt. No. 119 at 2.) This stipulation applies to both the Klamath Investments and the NPR Investments.

**[FF312]**    The Taxpayers paid the taxes to IRS as well as the penalties and interest which the IRS claimed was due as a result of the Klamath and NPR Investments. Payments were made promptly after the IRS made those demands. (DX269, DX271, DX273.) Thus, the Taxpayers did not use litigation as an effort to delay making payment to the IRS. (*See also* Tr. I 67:15–17 (Patterson).)

**[FF313]**    The Taxpayers each testified that they had a good-faith belief that the penalties asserted against them should never have been asserted. (Tr. I at 67:15–23 (Patterson), 129:15–20 (Patterson), 237:2–16 (Roach); Tr. II at 56:1–12 (Nix).) Mr. Patterson further testified that he believed the Taxpayers acted in good faith throughout the partnership-level proceedings. (Tr. I at 129:15–20.)

### N.    Witnesses

**[FF314]**    The Court finds the witnesses' live testimony in this case credible including Mr. Nix, Mr. Patterson, Mr. Roach, Mr. Johnston, Mr. Murray, and IRS Agent Carlo Sanchez-Garcia.

**[FF315]**    The Taxpayers communicated with each other throughout the entire investment process, from the initial meetings in New York with Sidley & Austin and DGI, to the actual decision to invest, to the decision to withdraw from NPR. (Tr. II at 61:2–8 (Nix).) The Court finds that one Taxpayer's account of these events, as testified to, is sufficient to support the other Taxpayers' account of the same events, to the extent, if any, that Mr. Patterson, Mr. Roach, or Mr. Nix did not specifically testify about a specific matter, but which matter was addressed by one or more of these Taxpayers.

**[FF316]**    The Court further finds the experts proffered by the Taxpayers were qualified to offer the expert testimony which they provided in this case.

## II.   CONCLUSIONS OF LAW

### A.    Legal Standard

#### 1.    Federal Rule of Civil Procedure 52

**[CL1]**    "If a party has been fully heard on an issue . . .  the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or

defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). Such a judgment "must be supported by findings of fact and conclusions of law." *Id.*

**[CL2]**     The purpose of these findings is to "afford[] . . . a clear understanding of the ground or basis of the decision of the trial court." *S. S. Silberblatt, Inc. v. U.S. for Use & Benefit of Lambert Corp.*, 353 F.2d 545, 549 (5th Cir. 1965) (internal quotation marks omitted); *see also Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (explaining that trial courts need not "recite every piece of evidence" or "sort through the testimony of . . . dozen[s] [of] witnesses").

**[CL3]**     In making a particular finding, the district court "does not . . . draw any inferences in favor of the non-moving party and . . . [instead] make[s] a determination in accordance with its own view of the evidence." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 n.1 (5th Cir. 2016) (internal quotation marks omitted). However, a district court still must arrive at each of its factual determinations based on the applicable burden of proof. *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (reversing the district court because it applied the preponderance of the evidence standard rather than the clear and convincing standard in making its factual determinations under Rule 52).

### 2.     <u>Burden of Proof</u>

**[CL4]**     Under 26 U.S.C. § 7491, the Government bears the burden of proof with respect to factual issues relevant to the taxpayer's tax liability under subtitle A if the taxpayer: (1) presents credible evidence with respect to any factual issue relevant to ascertaining tax liability; (2) complies with all requirements to substantiate any item and maintains all records required by the Internal Revenue Code or Treasury Regulations; and (3) cooperates with reasonable IRS requests for witnesses, information, documents, meetings, and interviews. 26 U.S.C. § 7491(a)(1)–(2).

**[CL5]**    "As a general rule, the Commissioner's determination of a tax deficiency is presumed correct, and the taxpayer has the burden of proving the determination to be erroneous." *Hatcher v. Commissioner*, 726 F. App'x 207, 218 (5th Cir. 2018) (quoting *Brinkley v. Commissioner*, 808 F.3d 657, 663 (5th Cir. 2015).

**[CL6]**    However, "[i]f both parties satisfy their respective production burdens by offering credible evidence, 'the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof or preponderance.'" *Hatcher*, 726 F. App'x at 218 (quoting *Whitehouse Hotel Ltd. Partnership v. Commissioner*, 615 F.3d 321, 332 (5th Cir. 2010)).

**[CL7]**    The district court need not explicitly determine whether the burden of proof shifted under 26 U.S.C. § 7491 so long as "both parties offer[] admissible, credible evidence for trial." *Hatcher v. Commissioner*, 726 F. App'x 207, 218–19 (5th Cir. 2018) (citing *Whitehouse Hotel Ltd. Partnership v. Commissioner*, 615 F.3d 321, 332 (5th Cir. 2010)).

**[CL8]**    The Fifth Circuit has also held that "the operation of this burden-shifting scheme is irrelevant where both parties have met their burdens of production and the preponderance of the evidence supports one party." *Brinkley*, 808 F.3d at 664.

**[CL9]**    Unless specifically noted otherwise, the Court concludes that Taxpayers have met the requirement under Section 7491 to offer credible evidence. The Court is satisfied that it could make a determination on the material issues based solely on the evidence presented by Taxpayers. *See Southgate Master Fund, LLC ex rel. v. Montgomery Capital Advisors, LLC*, 651 F. Supp. 2d 596, 649 (N.D. Tex. 2009).

**[CL10]**     Unless specifically noted otherwise, the Court concludes that for the purposes of Section 7491, Taxpayers have also complied with all requirements to substantiate items and maintain records. *See id.* at 649–50.

**[CL11]**     Unless specifically noted otherwise, the Court further concludes that, based on the Parties' stipulation and credible testimony from the Taxpayers, Taxpayers have met the requirement under Section 7491 to cooperate with IRS requests for witnesses, information, documents, meetings, and interviews.

**[CL12]**     Accordingly, the Court concludes that, unless specifically noted otherwise, Taxpayers have met their burden under Section 7491 to shift the burden of proof to the Government.[11]

**[CL13]**     However, based on the weight of the evidence as presented, the Court concludes that it would rule in the same way, regardless of the burden of proof on any particular issue. *See Hatcher*, 726 F. App'x at 218; *see also Brinkley*, 808 F.3d at 664.

### 3.     <u>The TEFRA Framework</u>

**[CL14]**     Partnership-related tax matters fall under the Tax Treatment of Partnership Items Act of 1982 ("TEFRA"), which provides the Internal Revenue Service ("IRS") and taxpayers with procedures to address a partnership's return in a single proceeding without having to resort to duplicative deficiency proceedings at the individual partner level. *See U.S. v. Woods*, 134 S. Ct. 557, 562–63 (2013). Under TEFRA, partnership-related tax matters advance in two stages.

---

[11] The Court notes that the Government did not address whether the burden shifted in their Proposed Findings of Fact and Conclusions of Law (Dkt. No. 124) despite this being identified as an issue for the Court to decide in the Joint Proposed Pretrial Order, which was submitted and executed by both Parties. (Dkt. No. 102 at 8.)

**[CL15]**     During the first stage, the IRS initiates proceedings to address partnership items through a partnership-level TEFRA audit and issues a final partnership administrative adjustment ("FPAA"). *U.S. v. Woods*, 134 S. Ct. 557, 563–64 (2013). The partners may seek judicial review of the FPAA to determine whether any penalty can be applied at the partnership level. *See NPR Investments*, 740 F.3d at 1009–10 (quoting *Woods*, 134 S. Ct. at 564). The "applicability of any penalty . . . which relates to an adjustment to a partnership item is **conclusive** in a subsequent refund action." *See Woods*, 134 S. Ct. at 564 (quoting § 6230(c)(4)) (emphasis added) (internal quotations omitted).

**[CL16]**     During the second stage, the tax penalties imposed at the partner-level are reflected by the IRS making computational adjustments to the tax liability of the individual partners. *See NPR Investments*, 740 F.3d at 1009–10; *see also* 26 U.S.C. § 6230(a).  Each partner may then challenge those adjustments in a partner-level proceeding by filing an administrative refund claim on grounds that (1) the IRS erroneously computed adjustments when applying the FPAA or the decision of a court in an action brought under § 6226; (2) the IRS failed to allow a credit or to make a refund attributable to the application of the FPAA or the decision of a court in an action brought under § 6226; or (3) the IRS erroneously imposed any penalty related to an adjustment to a partnership item. *See* 26 U.S.C. § 6230(c)(1)(A)–(C).

**[CL17]**     There is no review of substantive issues in the refund suit because the determination under the FPAA or the court's decision concerning the applicability of any penalty is conclusive. *See* 26 U.S.C. § 6230(c)(4); *see also* 26 C.F.R. § 301.6221-1(c) ("Assessment of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item shall be made based on partnership-level determinations."). "Partnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty,

addition to tax, or additional amount, other than partner-level defenses." 26 C.F.R. § 301.6221-1(c).

**[CL18]**    The refund suit is limited to partner-level defenses that may apply or challenges to the amount of the computational adjustment as applied to the individual partner. *See* 26 U.S.C. § 6230(c)(4).

**[CL19]**    Partner-level defenses are "those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level." 26 C.F.R. § 301.6221-1(d).

### 4. <u>Accuracy Related Penalties</u>

a.    <u>Reasonable Cause and Good Faith Defense</u>

**[CL20]**    "No penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1). Reasonable cause and good faith under § 6664(c)(1) is a complete defense to any accuracy-related penalties. *See Southgate Master Fund, LLC ex rel. v. Montgomery Capital Advisors, LLC*, 659 F.3d 466, 492 (5th Cir. 2011).

**[CL21]**    "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." 26 C.F.R. § 1.6664-4(b). "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *See id.*

**[CL22]**    "The most important factor is the extent of the taxpayer's effort to assess his proper liability in light of all of the circumstances." *See id.*; *see also Klamath*, 568 F.3d at 548.

**[CL23]**    Whether the taxpayer enters a transaction without a profit motive does not necessarily defeat a taxpayer's entitlement to the reasonable cause and good faith defense. *See Southgate*, 659 F.3d at 482, 492 (affirming district court's finding of reasonable cause and good faith when taxpayer acted with mixed motives by "investing in Southgate both because it posed profit potential and because it offered tax benefits"); *see also Compaq Computer Corp. and Subsidiaries v. Commissioner*, 277 F.3d 778, 786–87 (5th Cir. 2001) (finding that a primary motive of gaining "otherwise unavailable tax benefits to offset unrelated tax liabilities" does not invalidate the underlying transaction for tax purposes); *Chamberlain v. Commissioner*, 66 F.3d 729, 733 n.23 (5th Cir. 1995) (finding lack of profit motive was not outcome determinative to a defense against a negligence penalty when there was reasonable reliance on the advice of a tax expert); *Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978) ("The fact that favorable tax consequences were taken into account by Lyon on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that tax laws affect the shape of nearly every business transaction.").

**[CL24]**    The taxpayer bears the burden of proof when invoking the reasonable cause and good faith defense. *See Klamath*, 568 F.3d at 548; *Hatcher v. Commissioner*, 726 Fed. App'x 207, 217 (5th Cir. 2018).

b.    <u>Reliance on Advice of a Professional Tax Adviser</u>

**[CL25]**    One way of establishing the reasonable cause and good faith defense is for the taxpayer to demonstrate reasonable reliance on a professional tax advisor. *See* 26 C.F.R. § 1.6664-4(b)(1), (c); *see also American Boat Co., LLC v. U.S.*, 583 F.3d 471, 481 (7th Cir. 2009). However,

reliance on the advice of a professional tax advisor does not necessarily demonstrate reasonable cause and good faith; rather the validity of this reliance turns on 'the quality and objectivity of the professional advice which they obtained.'" *Klamath*, 568 F.3d at 548 (quoting *Swayze v. United States*, 785 F.2d 715, 719 (9th Cir. 1986); *Brinkley v. Commissioner*, 808 F.3d 657, 668 (5th Cir. 2015).

[CL26]    "Courts have frequently held that 'reasonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney . . . even when such advice turned out to have been mistaken." *See United States v. Boyle*, 469 U.S. 241, 250 (1985). "[W]hen an accountant or attorney ***advises*** a taxpayer on a matter of tax law, such as whether liability exists, it is reasonable for the taxpayer to rely on that advice." *Chamberlain v. Commissioner*, 66 F.3d 729, 732–33 (5th Cir. 1995) (quoting *Boyle*, 469 U.S. at 251) (emphasis in original).

[CL27]    "All facts and circumstances must be taken into account in determining whether a taxpayer has reasonably relied in good faith on advice (including the opinion of a professional tax adviser) as to the treatment of the taxpayer (or any entity, plan, or arrangement) under Federal tax law. For example, the taxpayer's education, sophistication and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith." 26 C.F.R. § 1.6664-4(c).

[CL28]    "The advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, the advice must take into account the taxpayer's purposes (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer

knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner." 26 C.F.R. § 1.6664-4(c)(1); *but see Green v. Commissioner*, 507 F.3d 857, 872 (5th Cir. 2007) (affirming denial of reasonable cause and good faith defense where "there was no evidence as to what [the taxpayer] told the preparer, what the preparer told [the taxpayer], and whether or not [the taxpayer's]reliance on any advice from the preparer was reasonable").

[CL29]     "Advice is any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly, with respect to the imposition of the section 6662 accuracy-related penalty. Advice does not have to be in any particular form." 26 C.F.R. § 1.6664-4(c)(2).

[CL30]     A certified public accountant can be a qualified tax advisor. *See, e.g.*, *Southgate*, 651 F. Supp. 2d at 599; *Rawls Trading, L.P. v. Commissioner*, T.C. Memo 2012-340, 2012 WL 6049630, at *13 (Dec. 5, 2012); *106 Ltd. v. Commissioner*, 136 T.C. No. 3 (2011).

[CL31]     "Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney." *United States v. Boyle*, 469 U.S. 241, 251 (1985). Thus, while "the taxpayer's education, sophistication and business experience" are relevant, the taxpayer is not required to "challenge the expert" or to "seek a second opinion" because that would undermine the purpose of seeking the expert's advice in the first place. *See Chamberlain v. Commissioner*, 66 F.3d 729, 734 (5th Cir. 1995); *see also* 26 C.F.R. § 1.6664-4(c).

[CL32]     The reliance must be objectively reasonable, meaning "[t]axpayers may not rely on someone with an inherent conflict of interest," *Chamberlain*, 66 F.3d at 732 (citing *Goldman*

*v. Commissioner*, 39 F.3d 402, 408 (2d Cir. 1994) ("Appellants cannot reasonably rely for professional advice on someone **they know** to be burdened with an inherent conflict of interest.") (emphasis added)), or someone known to be a promoter of a tax scheme. *Palm Canyon X Invs., LLC v. Commissioner*, No. 16-1334, 2018 WL 1326394, at *4 (D.C. Cir. Feb. 16, 2018) (citing *106 Ltd. v. Commissioner*, 684 F.3d 84, 91–92 (D.C. Cir. 2012); *Van Scoten v. Commissioner*, 439 F.3d 1243, 1253 (10th Cir. 2006)).

[CL33]    The Fifth Circuit has applied these principles to hold that taxpayers—even those engaged in what the IRS called "abusive" or "tax motivated" transactions—are not liable for a penalty if they reasonably relied on professional tax advice. *See e.g.*, *Southgate*, 659 F.3d at 489 (finding reasonable cause even though underlying partnership was a sham); *Chamberlain*, 66 F.3d at 733 n.23 (holding that "one may enter into a transaction without a profit motive but not be negligent in claiming a tax loss if that claim is in reasonable reliance on the advice of a tax expert").

c.    <u>IRS Notices</u>

[CL34]    The Tax Court has refused "to impute to a taxpayer claiming reliance on a professional adviser knowledge of all policy statements published by the IRS to date." *See CNT Invs., LLC v. Commissioner*, 144 T.C. No. 161, 231–32 (2015) (citing *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885, 902, 904–5 (E.D. Tex. 2007)).

[CL35]    While the Fifth Circuit has not directly addressed how a public notice issued by the IRS affects the reasonable cause and good faith analysis, other courts have differing views on the weight they give IRS notices. *Compare Palm Canyon*, 2018 WL 1326394, at *10 (finding the IRS Notice made "proof of reasonableness [] an especially steep uphill battle"), *with CNT Invs., LLC v. Comm'r*, 144 T.C. 161, 232 (2015) (finding a taxpayer's knowledge of an IRS notice "did not necessarily demonstrate a lack of good faith in failing to follow IRS administrative guidance").

**[CL36]**      However, numerous courts, including this Court in *Klamath*, have held that taxpayers who engaged in transactions similar to those described in Notice 2000-44 were not liable for any penalty because they acted reasonably and in good faith. *See, e.g.*, *Am. Boat Co.,* 583 F.3d at 483-86; *Tucker v. Commissioner*, T.C. Memo 2017-183 at *26–28 (2017); *CNT Inv'rs*, 144 T.C. at 229–35.

### 5.      Interest Suspension Under § 6404(g)

**[CL37]**      Under 26 U.S.C. § 6404(g), underpayment interest is suspended in certain situations where the IRS fails to notify the taxpayer of a proposed adjustment within a specific time after the taxpayer's return was filed. 26 U.S.C. § 6404(g).

**[CL38]**      Section 6404(g) provides as follows:[12]

> **(1)(A) IN GENERAL.**—In the case of an individual who files a return of tax imposed by subtitle A for a taxable year on or before the due date for the return (including extensions), if the Secretary does not provide a notice to the taxpayer specifically stating the taxpayer's liability and the basis for the liability before the close of the 1-year period (18-month period in the case of taxable years beginning before January 1, 2014) beginning on the later of—
>
> > (i) the date on which the return is filed; or
> > (ii) the due date of the return without regard to extensions,
>
> the Secretary shall suspend the imposition of any interest, penalty, addition to tax, or additional amount with respect to any failure relating to the return which is computed by reference to the period of time the failure continues to exist and which is properly allocable to the suspension period . . . .
>
> **(3) SUSPENSION PERIOD.**—For purposes of this subsection, the term 'suspension period' means the period—

---

[12] This version of § 6404(g) is not the most recent version of the statute, which now provides that the Secretary must provide notice before the close of the "36-month period." 26 U.S.C. § 6404(g). However, the interest at issue relates to the 2000 and 2001 tax years, during which time § 6404(g) applied an 18-month period for taxable years beginning before January 1, 20014. *See* U.S Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, § 8242(b) 121 Stat. 112, 200 (2007) (amendment of subsection (g) by substituting "18-month period" with "36-month period" is applicable to IRS notices after 11/25/2007).

(A) beginning on the day after the close of the 1-year period (18-month period in the case of taxable years beginning before January 1, 2014) under paragraph (1); and

(B) ending on the date which is 21 days after the date on which notice described in paragraph (1)(A) is provided by the Secretary.

26 U.S.C. § 6404 (1998).

**[CL39]**    For interest related to taxable years beginning before January 1, 2014, the suspension period applies eighteen (18) months after the return is filed or the due date of the return, whichever is later. 26 U.S.C. § 6404 (1998).

**[CL40]**    On October 3, 2004, Congress eliminated the benefit of interest suspension for any underpayment of tax related to a "listed" transaction. American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 903(a)–(c), 118 Stat. 1418, 1652 (2004); 26 U.S.C. § 6404(g)(2)(E) (2004) (eliminating the interest suspension benefit for any interest "with respect to any reportable transaction with respect to which the requirement of section 6664(d)(2)(A) is not met and any listed transaction (as defined in 6707A(c))").

**[CL41]**    In 2005, Congress amended Section 6404(g) to retroactively revoke interest suspension in connection with any "listed" transactions accruing prior to October 3, 2004. Gulf Opportunity Zone Act of 2005, Pub. L. No. 109-135, § 303, 119 Stat. 2577, 2608 (2005). Under this amendment, any taxpayers who participate in listed transactions are not eligible for § 6404(g) interest suspension, regardless of when the interest accrued.

**[CL42]**    There is a narrow exception to this bar. Under Section 301.6404-4 of the Treasury Regulation, interest suspension for listed transactions accruing before October 3, 2004, may still apply "to a taxpayer who is a participant in a settlement initiative with respect to that transaction, ***to any transaction in which the taxpayer has acted reasonably and in good faith***, or to a closed transaction." Treas. Reg. § 301.6404-4(b)(5)(ii) (emphasis added). The regulations

applicable to this rule have clarified the meaning of a "taxpayer acting in good faith," offering examples of such behavior. Treas. Reg. § 301.6404-4(b)(5)(ii)(B).

**[CL43]**    In determining whether a taxpayer "has acted reasonably and in good faith," the IRS takes into account "all the facts and circumstances surrounding the transaction." Treas. Reg. § 301.6404-4(b)(5)(ii)(B)(1). Such facts and circumstances include, but are not limited to:

> (1)    Whether the taxpayer disclosed the transaction;
>
> (2)    The taxpayer's course of conduct after being identified as participating in the transaction, including the taxpayer's response to opportunities afforded to the taxpayer to settle the transaction; and
>
> (3)    Whether the taxpayer engaged in unreasonable delay at any stage of the matter.

*Id.*

**[CL44]**    "If a taxpayer and the IRS promptly enter into a settlement agreement with respect to a transaction on terms proposed by the IRS or, in the event of atypical facts and circumstances, on terms more favorable to the taxpayer, and the taxpayer has complied with the terms of that agreement without unreasonable delay, the taxpayer will be presumed to have acted reasonably and in good faith except in rare and unusual circumstances." Treas. Reg. § 301.6404-4(b)(5)(ii)(B)(2). No such presumption exists in this case because Taxpayers did not enter into a settlement agreement.

**[CL45]**    Even if a taxpayer does not qualify for this presumption, such as the case here, the taxpayer may still be granted interest suspension under the general facts and circumstances described above. *See id.*

**[CL46]**    As an example of a taxpayer acting reasonably and in good faith, the applicable regulations describe the following hypothetical:

> [The taxpayer participated in a listed transaction. In a letter sent by the IRS directly to the taxpayer in July 2005, the IRS extended an offer of settlement. The July 2005

letter informed the taxpayer that, absent atypical facts and circumstances, the taxpayer should not expect resolution of the tax issues on more favorable terms than proposed in the letter. The taxpayer declined the proposed settlement terms of the letter and proceeded to Appeals to present what the taxpayer claimed were atypical facts and circumstances.] Appeals agrees that atypical facts were present that warrant additional concessions by the government. A settlement is reached on terms more favorable to the taxpayer than those proposed in the July 2005 letter. For purposes of the application of section 6404(g)(2)(E), this taxpayer is presumed to have acted reasonably and in good faith, and absent evidence of rare or unusual circumstances harmful to tax administration, is eligible for suspension of interest accruing on or before October 3, 2004, relating to the transaction in which the taxpayer participated.

*Id.*

**[CL47]**    While the penalties defense mainly focuses on the taxpayer's effort to assess the taxpayer's proper liability, the interest suspension defense considers factors such as the taxpayer's response to opportunities afforded to the taxpayer to settle the transaction and whether the taxpayer engaged in unreasonable delay at any stage of the matter. *Compare* Treas. Reg. § 1.6664-4(b), *with* Treas. Reg. § 301.6404-4 (5)(ii)(B). There is a temporal difference between these types of factors. The penalties defense considers the actions of the taxpayers *at the time the tax returns were filed*; the interest suspension defense considers the actions of the taxpayers *throughout the entire stage of the matter*, including *after* the taxpayers received notice of the underpayment. *Id.*

**[CL48]**    Thus, contrary to Taxpayers' assertions, there is a difference between the reasonable cause and good faith standards.

**[CL49]**    Notwithstanding the differences, there is significant overlap between the factors considered under both standards. Accordingly, it is proper for this Court to consider the partnership-level determinations, which are binding pursuant to 26 U.S.C. § 6230(c)(4), made in the Klamath Partnership-Level Proceeding and the NPR Partnership-Level Proceeding when determining whether Taxpayers are entitled to interest suspension.

### 6.    Deductions of Fees and Costs[13]

a.    Section 165(c)(2)

**[CL50]**    Taxpayers may deduct "losses incurred in any transaction entered into for profit, though not connected with a trade or business." 26 U.S.C. § 165(c)(2).

**[CL51]**    The language of the statute is clear that a profit motive is required to deduct losses. *See id.*

**[CL52]**    Although not binding on this Court, the Tax Court has found that Section 165(c)(2) requires the profit motive be present at both the partnership and the partner level before losses arising from participation in a partnership can be deducted. *Marinovich v. Commissioner*, T.C. Memo. 1999-179, 1999 WL 339316 (T.C. 1999) ("Under section 165(c)(2), in order for individual taxpayers to be entitled to loss deductions with respect to funds invested in partnerships, the underlying partnership transactions must have economic substance, and, at the partner level, the individual taxpayers must have had a profit objective for investing in the partnerships.") (collecting cases); *McElroy v. Commissioner*, T.C. Memo. 2014-163, 2014 WL 3928970 (T.C. 2014) ("[W]e naturally conclude that petitioner could not make a 'profit' from his investments in the partnerships as that term is defined without regard to the promoted tax benefits."); *see also Washburn v. Commissioner*, T.C. Memo. 2018-110, 2018 WL 3414233, at *9 (T.C. 2018) ("Before a taxpayer is entitled to deduct a loss under section 165(c)(2), he must demonstrate that he has entered into a transaction *the primary purpose* of which was to make a profit.") (emphasis added).

b.    Section 162(a)

**[CL53]**    Taxpayers may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a).

---

[13] Taxpayers did not raise the issue of deduction of "expenses for production of income" under 26 U.S.C. § 212.

**[CL54]**    However, "to be deductible [under § 162], such expenses must be incurred with the 'primary' objective of generating a profit." *Vest v. Commissioner*, 690 Fed. App'x 201, 212 (5th Cir. 2017); *see also Lopez v. Commissioner*, 116 Fed. App'x 546, 549 (5th Cir. 2004) ("Section 162(a) further notes that to be engaged in a trade or business a taxpayer 'must be involved in the activity with continuity and regularity and . . . the taxpayer's *primary purpose* for engaging in the activity must be for income or profit.'") (quoting *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987)) (emphasis added).

**[CL55]**    "Section 162(a) further requires that an item be paid or incurred and the benefit exhausted during the taxable year to be deductible." *Central Texas Sav. & Loan Ass'n v. United States*, 731 F.2d 1181, 1183 (5th Cir. 1984).

**[CL56]**    The Fifth Circuit has found that a one-time payment which secured a benefit that extended beyond the year in which the fee payment was made was not an annual expense under Section 162(a). *See id.*

> c.    A Profit Motive at the Partnership Level is Required to Deduct Fees Under Either Sections 165(c)(2) or 162(a)

**[CL57]**    The Fifth Circuit in *Klamath* held that "for the purposes of determining the deductibility of expenses it is the motive of the partnership that matters, regardless of whether certain operating expenses were borne by one partner or another." 568 F.3d at 550–51. The Fifth Circuit further held that "[t]he profit motive of a partnership is determined at the partnership level." *See id.*

**[CL58]**    While Nix and Patterson had a "genuine profit motive," the primary intent of the managing partner Presidio was "to achieve a tax benefit." *Id.* Based on the different motivations, the Fifth Circuit went on to conclude that "[t]he crucial inquiry, then is which

partner's intentions should be attributable to the Partnership." *Id.* at 551. This depended on which partner effectively controlled the partnership's activities. *Id.*

**[CL59]**    While the Fifth Circuit in *Klamath* was analyzing the deductibility of expenses under Section 212, this profit motive analysis is applicable to Sections 162 and 165. *See id.* at 551 (citing *Agro Science Co. v. Commissioner*, 934 F.2d 573, 576 (5th Cir. 1991) ("Expenditures may only be deducted under sections 162, 174, and 212 if the facts and circumstances indicate that the taxpayer made them primarily in furtherance of a bona fide profit objective independent of tax consequences.")).

**[CL60]**    When determining whether a taxpayer (i.e., a partner) can deduct fees and expenses related to a partnership transaction under Sections 162 and 165, the Court must consider not only the taxpayer's individual motives but also the partnership's motive. *See Klamath*, 568 F.3d at 550–51.

**[CL61]**    The Fifth Circuit subsequently confirmed as much in *NPR* when it found that the authorities appear to support the proposition that individual partners cannot deduct losses when the underlying partnership transaction lacks a profit motive. *See NPR Investments*, 740 F.3d at 1013 & n.69 (citing *Fidelity Int'l Currency Advisor A Fund, LLC v. United States*, 747 F. Supp. 2d 49, 236 (D.Mass.2010) ("Even if taxpayers invest in a partnership with the individual objective of making a profit, they are not entitled to deduct any amounts invested in the partnership as losses under Section 165(c)(2) if the partnership transactions are not entered into for profit.")).

**[CL62]**    Thus, the Court holds that for an individual taxpayer (i.e., partner) to deduct losses or expenses arising out of their investment in a partnership, both the partnership and the individual taxpayer must have had a profit motive. *See Fidelity*, 747 F. Supp. 2d at 236 ("Under Section 165(c)(2), in order for individual taxpayers to be entitled to loss deductions arising out of

their investment in a partnership, the underlying partnership transactions must have been entered into for a profit motive, and, at the partner level, the individual taxpayers must have had a profit objective for investing in the partnerships."); *accord NPR*, 740 F.3d at 1013 & n.69 ("NPR and the Taxpayers have conceded that NPR lacked a profit motive and that this precludes the Taxpayers from deducting the losses.").

### 7.    <u>Untimely Assessments</u>

**[CL63]**    The IRS has one year from the conclusion of a partnership-level proceeding to make tax assessments to partnership items. *See* 26 U.S.C. § 6229(a), (d).

**[CL64]**    "If the IRS decides to reimpose a validly abated assessment, it should make the new assessment within the relevant statutory limitations period" *Matter of Bugge*, 99 F.3d 740, 744 (5th Cir. 1996).

**[CL65]**    However, "[a]n unauthorized and accidental abatement of an entire assessment . . . is not effective." *Id.* at 745. An "accidental abatement" includes a purely accidental and unintended processing error by the regional service center which lacks any authorization. *See id.*

**[CL66]**    Moreover, "[w]henever an abatement is issued because of a mistake of fact or bookkeeping error, the assessment can be reinstated, at least so long as this does not prejudice the taxpayer." *Crompton–Richmond v. United States,* 311 F. Supp. 1184, 1187 (S.D.N.Y. 1970).

**[CL67]**    The Government is not bound by the errors of its agents when the error is administrative rather than substantive. *See Crompton*, 311 F. Supp. at 1187.

**[CL68]**    A conscious decision by IRS personnel to execute the abatement is not a clerical error. *Bugge*, 99 F.3d at 745, n.6.

**[CL69]**    Notwithstanding the above, an assessment cannot be reinstated due to error if such error prejudices the taxpayer. *See Bugge*, 99 F.3d at 746 n.7.

B.    **Analysis**

1.    **The Taxpayers Are Not Liable for the Penalties Related to NPR.**

**[CL70]**    The Taxpayers are entitled to a full refund of the penalties that they paid to the Government under protest with respect to the NPR Investments transaction because the Taxpayers acted reasonably and in good faith in their reporting of the tax consequences of that transaction. Reasonable cause and good faith is a complete defense to the accuracy-related penalties.

**[CL71]**    The Taxpayers sought advice from qualified tax professionals concerning the legal consequences and tax liabilities of their investments and how to properly report such investments once they withdrew. The Taxpayers relied on a multi-national law firm to write a detailed tax opinion that specifically addressed accuracy related penalties under Section 6662 and the IRS Notice 2000-44. The Taxpayers also sought further advice from an experienced accounting firm with whom they had a longstanding and trusting relationship. The record reflects that the Taxpayers reasonably relied on such tax advice to assess their tax liability. The Taxpayers are not required to challenge the advice or to seek a second opinion. *See Chamberlain*, 66 F.3d at 733.

**[CL72]**    The Taxpayers were known risk-takers who were accustomed to risky financial investments because of their line of work, and the record reflects that, although far from assured, there was a genuine potential for profit with the NPR Investments. The record also reflects that the Taxpayers entered the NPR Investments with a mixed motive to gain both a profit and tax benefits. Thus, that they entered the transactions with some tax motive, in addition to underlying profit motive to "hit the sweet spot", does not prevent them from asserting a reasonable cause and good faith defense. *See Southgate*, 659 F.3d at 482, 492.

**[CL73]**    In light of all the facts and circumstances within the record, the Court concludes that the Taxpayers acted with reasonable cause and good faith.

a.    Tax Opinion from Sidley Austin

**[CL74]**    Sidley Austin, a global law firm, was a qualified tax advisor not burdened by any conflict of interest.

**[CL75]**    The Taxpayers disclosed "all pertinent facts and circumstances" to Sidley Austin and the tax opinion considered those facts and circumstances, took into account the Taxpayers' purposes, and did not rely on unreasonable assumptions, representations, or statements from the Taxpayers. *See* 26 C.F.R. § 1.6664-4(c)(1); *Southgate*, 659 F.3d at 493–94.

**[CL76]**    The Taxpayers followed the advice they received from Sidley Austin. *See Southgate*, 659 F.3d at 493.

**[CL77]**    It was reasonable for the Taxpayers to rely on the comprehensive tax opinion from Sidley Austin.

**[CL78]**    The Taxpayers inquired as to any potential conflicts of interest and were unaware of any conflicts of interest at the time they sought the tax advice. *See Chamberlain*, 66 F.3d at 732 (citing *Goldman v. Commissioner*, 39 F.3d 402, 408 (2d Cir. 1994)).

**[CL79]**    While R.J. Ruble was identified in an unrelated opinion from the Southern District of New York as a co-designer of the Optional Partnership Strategy ("OPS"), which is a "tax strategy designed to enable individuals or corporations to achieve tax savings through the use of European-style digital options," such does not make Taxpayers' reliance on his tax advice unreasonable.

b.    Tax Advice from Pollans & Cohen

**[CL80]**    Pollans & Cohen was a qualified tax advisor.

**[CL81]**    At the time the Taxpayers sought advice from Pollans & Cohen, they did not know that Mr. Cohen received a fee from Diversified. *See Chamberlain*, 66 F.3d at 732 (citing *Goldman v. Commissioner*, 39 F.3d 402, 408 (2d Cir. 1994)). The Taxpayers exercised typical and reasonable due diligence in inquiring as to potential conflicts of interest related to their tax advisors.

**[CL82]**    The Taxpayers disclosed "all pertinent facts and circumstances" to Pollans & Cohen, and the tax advice considered those facts and circumstances, took into account the Taxpayers' purposes, and did not rely on unreasonable assumptions, representations, or statements from the Taxpayers. *See* 26 C.F.R. § 1.6664-4(c)(1); *Southgate*, 659 F.3d at 493–94.

**[CL83]**    Despite the Government's arguments to the contrary, Pollans & Cohen's role was as a true tax advisor rather than merely an administrative role. For the purposes of the reasonable cause and good faith defense, the Court concludes that Pollans & Cohen's advice constituted "advice" as defined in the regulation. *See* 26 C.F.R. § 1.6664-4(c)(2). The Treasury regulations also expressly provide that advice "does not have to be in any particular form" (i.e., written) for taxpayers to be able to rely on it. *See id.*

**[CL84]**    The Taxpayers followed the advice they received from Pollans & Cohen.

**[CL85]**    It was reasonable for the Taxpayers to rely on the comprehensive tax advice from Pollans & Cohen.

c.    IRS Notice 2000-44

**[CL86]**    At the trial, the Government argued that the Taxpayers' reliance on the tax advice was not reasonable because the IRS Notice 2000-44 identified Son of BOSS transactions

as abusive. However, the tax advice that Taxpayers sought specifically addressed IRS Notice 2000-44 and concluded that it did not apply to the underlying transactions. The law does not require that the Taxpayers "challenge" or "second-guess" comprehensive tax advice. *See Chamberlain*, 66 F.3d at 734.

**[CL87]**    The Court thus concludes that the Taxpayers' reliance on the tax advice from Sidley Austin and Pollans & Cohen was reasonable, even in light of IRS Notice 2000-44.

### 2.    The Taxpayers Are Entitled to Interest Suspension Because They Acted Reasonably and in Good Faith.

#### a.    Interest Suspension Related to Klamath and Kinabalu

**[CL88]**    With respect to any underpayment of tax attributable to his investment in the Klamath partnership, Mr. Patterson is entitled to interest suspension from March 4, 2003 through August 9, 2004 for his 2000 tax year, and April 3, 2004 through October 3, 2004 for his 2001 tax year, because he acted reasonably and in good faith within the meaning of the exception to the retroactive elimination of interest suspension.

**[CL89]**    With respect to any underpayment of tax attributable to his investment in the Kinabalu partnership, Mr. Nix is entitled to interest suspension from April 13, 2003 through August 9, 2004 for the 2000 tax year, and April 17, 2004 through October 3, 2004 for the 2001 tax year, because he acted reasonably and in good faith within the meaning of the exception to the retroactive elimination of interest suspension.

**[CL90]**    The interest suspension for the 2000 tax year for Mr. Patterson starts on March 4, 2003 because that date is eighteen months after he filed his 2000 tax return on September 4, 2001. (*See* DX269 at 000375.)

**[CL91]**    The interest suspension for the 2001 tax year for Mr. Patterson starts on April 3, 2004 because that date is eighteen months after he filed his 2001 tax return on October 3, 2001. (*See* DX269 at 000385.)

**[CL92]**    The interest suspension for the 2000 tax year for Mr. Nix starts on April 13, 2003 because that date is eighteen months after he filed his 2000 tax return on October 13, 2001. (*See* DX271 at 000346.)

**[CL93]**    The interest suspension for the 2001 tax year for Mr. Nix starts on April 17, 2004 because that date is eighteen months after he filed his 2001 tax return on October 17, 2001. (*See* DX271 at 000346.)

**[CL94]**    The interest suspension for the 2000 tax year ends on August 9, 2004 because that is twenty-one (21) days after the date on which IRS issued both Mr. Nix and Mr. Patterson the Final Partnership Administrative Adjustments ("FPAA")—July 19, 2004.[14]

**[CL95]**    The interest suspension for the 2001 tax year ends on October 3, 2004 because that is the date that Congress prospectively eliminated interest suspension for listed transactions. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 903(a)–(c), 118 Stat. 1418, 1652 (2004); 26 U.S.C. § 6404(g)(2)(E) (2004) (eliminating the interest suspension benefit for any interest "with respect to any reportable transaction with respect to which the requirement of section 6664(d)(2)(A) is not met and any listed transaction (as defined in 6707A(c))").

**[CL96]**    The Governments' position that the interest suspension end date for the 2001 tax year should be August 9, 2004 is incorrect. The Government contends that "the issuance of an

---

[14] The Parties do not dispute this date. *Compare* Dkt. No. 125 at 58 (Taxpayers' Proposed Findings of Fact and Conclusions of Law), *with* Dkt. No. 124 at 19–20 (Government's Proposed Findings of Fact and Conclusions of Law). The IRS issued a notice of deficiency to Patterson individually and a FPAA to Klamath on July 19, 2004. (Dkt. No. 72 at 6.) The IRS issued a notice of deficiency to Nix individually and a FPAA to Kinabalu on July 19, 2004. (*Id.*)

FPAA by the IRS to the relevant partnerships triggers the statutory notice required to end any interest suspension 21 days later." (Dkt. No. 124 at 19.)

[CL97]    According to the Government, the FPAAs that issued to Klamath and Kinabalu provided "notice to the taxpayer[s] specifically stating the taxpayer[s'] liability and the basis for the liability" so that interest suspension ended twenty-one days later as provided by § 6404(g). (Dkt. No. 124 at 19–20.) The Government offered no evidence at trial to show how the FPAAs that were issued to Klamath and Kinabalu gave Mr. Patterson and Mr. Nix notice of their individual liability. Accordingly, interest suspension for 2001 ended on October 3, 2004.

[CL98]    The provision that adopted the issuance of the FPAA as the notice to trigger the end of the suspension period was made "effective on August 22, 2011." *See* Treas. Reg. § 301.6404-4(a)(7)(ii), (d) ("Documents provided by the IRS during a TEFRA partnership proceeding that may contain information sufficient to satisfy the notice requirements include, but are not limited to, a Notice of Final Partnership Administrative Adjustment (FPAA)."). Thus, that provision is not applicable here.

[CL99]    The Government argues the Fifth Circuit's holding in *Sealy* that the FPAA is the "functional equivalent of a notice of deficiency" is "consistent with the later promulgated Treasury regulation under Section 6404(g) adopting the issuance of the FPAA as the notice to trigger the end of the suspension." (Dkt. No. 124 at 19 (citing *Sealy Power, Ltd. v. Commissioner*, 46 F.3d 382, 386 (5th Cir. 1995).) However, the notice under § 6404(g) must "stat[e] the taxpayer's liability and the basis for the liability." The Fifth Circuit in *Sealy* makes no such finding nor does it discuss the effect of an FPAA within the confines of § 6404(g). *See id.* ("Both the FPAA and the notice of deficiency serve to notify affected taxpayers that the Commissioner has made a ***final administrative determination*** of their liability for particular years.") (emphasis added).

**[CL100]**    The regulation-at-issue specifies an "effective/applicability date," which makes paragraph (a) effective on August 22, 2011. *See* Treas. Reg. § 301.6404-4 (d). The Government's reading would render that paragraph superfluous.

**[CL101]**    In *Klamath*, this Court considered "all the circumstances," 472 F. Supp. 2d at 904, in finding that Mr. Patterson and Mr. Nix acted reasonably and in good faith (as it relates to accuracy related penalties) with respect to their tax reporting of their investments in the Klamath and Kinabalu partnerships. *Id.* at 905. The Fifth Circuit affirmed. *Klamath*, 568 F.3d at 548.

**[CL102]**    This Court also noted in *Klamath* that "[i]t bears mention that, although the Presidio investment plan suggested the formation of a grantor trust (which might have been used to conceal the transaction from the IRS), these taxpayers reported the use of the grantor trust directly on their tax returns, pursuant to the advice of their accountants to disclose the tax treatment to the IRS." 472 F. Supp. 2d at 905. The Court thus concludes, consistent with the factual findings in the partnership-level proceeding which are binding on this proceeding, that Mr. Patterson and Mr. Nix disclosed the transaction.

**[CL103]**    The Court concludes that Mr. Patterson and Mr. Nix pursued the *Klamath* litigation in good faith without unreasonable delay. Both Mr. Patterson and Mr. Nix testified that they pursued the litigation based on their good-faith belief in the positions they were taking with respect to the accuracy-related penalties and other tax reporting issues.

**[CL104]**    The Court further concludes that Mr. Patterson's and Mr. Nix's conduct was reasonable after they were identified as participating in the Klamath Transactions. The Parties stipulated that Taxpayers "were reasonable in their 'response to opportunities afforded to [them] to settle the transaction[s]' and attempted to settle the transactions at issue in good faith." (Dkt. No. 119 at 2.)

**[CL105]**    The Government argues that the Taxpayers' "full fledged refusal to concede the artificial tax losses arising from Klamath at the administrative level before paying those amounts solely for the purpose of obtaining federal court jurisdiction under 26 U.S.C. § 6226(f) to engage in a multi-year court battle and appeal over those tax liabilities was not reasonable." (Dkt. No. 124 at 16.) The Government further argues that "while Nix and Patterson might have been excused for penalties in *Klamath* because of what they allegedly did not know when they filed their 2000 and 2001 tax returns, they were not entitled to continue that willful blindness after the IRS and Congress revealed the truth about those purported loans in 2002 and 2003." (*Id.* at 17.) The Court finds the Government's arguments unpersuasive.

**[CL106]**    That Mr. Patterson and Mr. Nix challenged the tax assessments and penalties in a refund suit does not make their actions unreasonable. Indeed, the statutory framework exists to provide a procedural mechanism by which partnerships and individual partners can challenge the IRS' assessments.

**[CL107]**    Other than that Mr. Patterson and Mr. Nix refused to concede "the artificial tax losses," the Government presented no evidence that either Mr. Patterson or Mr. Nix delayed the *Klamath* litigation in any way.

**[CL108]**    Even in light of Notice 2000-44, two different law firms had advised Mr. Patterson and Mr. Nix that "[i]t [wa]s more likely than not that the authorities cited in Notice 2000-44 would not provide a basis for denying the deduction of a loss sustained from the transactions at issue [in the Klamath Transactions]."

**[CL109]**    This Court found in *Klamath* that Mr. Patterson and Mr. Nix had "no knowledge" of agreements and understandings by Presidio and NatWest "that the Funding

Amounts would not be used to provide leverage for foreign currency transactions." 472 F. Supp. 2d at 897.

**[CL110]**    The Court thus concludes that Mr. Patterson and Mr. Nix acted reasonably and in good faith at all stages of this matter. They are entitled to interest suspension for the time periods described above for the 2000 and 2001 tax years.

b.    <u>Interest Suspension Related to NPR</u>

**[CL111]**    With respect to any underpayment of tax attributable to his investment in the NPR Transactions, Mr. Roach is entitled to interest suspension from February 18, 2004 through October 3, 2004 for the 2001 tax year because he acted reasonably and in good faith within the meaning of the exception to the retroactive elimination of interest suspension.

**[CL112]**    The interest suspension for the 2001 tax year for Mr. Roach starts on February 18, 2004 because that date is eighteen months after he filed his 2001 tax return on August 18, 2002. (*See* DX273 at 000401.)

**[CL113]**    The interest suspension for the 2001 tax year ends on October 3, 2004 because that is the date it was prospectively eliminated by Congress.

**[CL114]**    While neither Mr. Patterson nor Mr. Nix utilized losses from the NPR transaction in 2001, they are entitled to interest suspension for the tax effect of those deductions.[15]

**[CL115]**    Mr. Patterson is entitled to interest suspension for the period April 3, 2004 through October 3, 2004 for his 2001 tax year.

**[CL116]**    Mr. Nix is entitled to interest suspension from April 17, 2004 through October 3, 2004 for the 2001 tax year.

---

[15] This is also based on the Court's ruling that the Taxpayers are not entitled to deduct the fees and costs associated with the NPR Investments transactions. *See infra* Section II.B.3.

**[CL117]**    The Taxpayers are entitled to interest suspension because they acted reasonably and in good faith within the meaning of the exception to the retroactive elimination of interest suspension.

**[CL118]**    The Taxpayers made full disclosures of the NPR Transactions.

**[CL119]**    The Court further concludes that the Taxpayers' conduct was reasonable after they were identified as participating in the NPR Transactions. The Parties stipulated that Taxpayers "were reasonable in their 'response to opportunities afforded to [them] to settle the transaction[s]' and attempted to settle the transactions at issue in good faith." (Dkt. No. 119 at 2.)

**[CL120]**    The Court concludes that the Taxpayers litigated the NPR litigation in good faith without delay and sought to resolve it as quickly as possible.

**[CL121]**    The Taxpayers testified that they pursued the litigation based on their good-faith belief in the positions they were taking with respect to the accuracy-related penalties and other tax reporting issues.

**[CL122]**    The Government presented no evidence that the Taxpayers delayed the NPR litigation in any way.

**[CL123]**    Indeed, the Government recognized that the Taxpayers did not cause any "unreasonable delay" in litigating the NPR litigation by conceding the full tax liability "early in the litigation [] leaving only the penalties to be tried." (*See* Dkt. No. 124 at 17–18; *see also id.* at 16 ("[T]he [Taxpayers] conceded that they were not entitled to any of the artificial tax losses or related expenses they claimed in NPR Investments before trial of that case.").)

**[CL124]**    The Government's Proposed Findings of Fact and Conclusions of Law focus on interest suspension as it relates to the Klamath Transactions and the corresponding conduct of Mr. Nix and Mr. Patterson. (*See generally* Dkt. No. 124 at 13–20.) The only argument the

Government advances relating to the NPR Transactions is that the "facts and circumstances surrounding the settlement of the actual tax liability arising from their transactions – which they fully litigated and lost, and not just the assessed penalties, should be considered and are not reasonable." (*Id.* at 16.) In light of the Parties' stipulation that the Taxpayers settled in good faith, the Court finds the Government's argument unpersuasive.

[**CL125**]    Accordingly, the Court concludes that the Taxpayers acted reasonably and in good faith at all stages of this matter. They are entitled to interest suspension for the time periods described above for the 2001 tax year.

### 3.    The Taxpayers Are Not Entitled to Deduct the Fees They Paid to DGI and Pollans & Cohen.

[**CL126**]    Taxpayers seek tax refunds based on the fees that they paid to DGI and Pollans & Cohen.

[**CL127**]    Taxpayers argue that the fees are deductible under either Section 165(c)(2) or 162(a) as "losses incurred in any transaction entered into for profit, though not connected with a trade or business" or "ordinary and necessary expenses paid or incurred . . . in carrying on any trade or business." (*See* Dkt. No. 125 at 54–56.)

[**CL128**]    These fees were a flat fee and not fees for services that were rendered over time.

[**CL129**]    The Fifth Circuit in *NPR* held that "NPR and the Taxpayers have conceded that NPR lacked a profit motive." *See NPR*, 740 F.3d at 1013. Partnership-level factual determinations are binding in this partner-level proceeding. Thus, the Court holds that the underlying partnership transaction to which the Taxpayers seek to deduct fees lacked a profit motive.

[**CL130**]    Since the underlying partnership transaction lacked a profit motive, the Court further holds that the Taxpayers cannot deduct the fees that they paid to DGI and Pollans & Cohen under either Sections 165(c)(2) or 162(a).

**[CL131]**    The Government also argues that the fees cannot be properly considered under Section 162(a) because the foreign currencies "were intended to be sold off over a period that exceeded the initial 2001 tax year, and were in fact sold in increments in 2001, 2002, and 2003 with a portion of the DGI and Cohen capitalized fees being included in each annual loss claimed for each of these three years." (Dkt. No. 124 at 21–22.) The Court agrees.

**[CL132]**    The benefit of the one-time fees paid to DGI and Mr. Cohen, which was to set up the foreign currency investments, was to extend beyond the year in which the fee payment was made. *See Central Texas*, 731 F.2d at 1183. Indeed, the Taxpayers testified that when they entered into these foreign currency transactions, they intended to remain in the NPR Transactions through the options' expiration.

**[CL133]**    As the benefit of the one-time fees was to extend beyond the year in which the fees were paid, the Court concludes that they cannot be considered under Section 162(a).

**[CL134]**    That these fees were paid directly from each Taxpayer to DGI and Mr. Cohen and were not paid by NPR to DGI or Mr. Cohen does not affect the Court's conclusion. The focus of the inquiry is whether the underlying partnership transaction had a profit motive not who ultimately paid the associated fees.

**[CL135]**    Even if it had not been previously conceded in the partnership-level proceeding that NPR lacked a profit motive, the Court would reach the same conclusion. The Fifth Circuit held in *NPR* that "[w]hen NPR was created, through the time that Taxpayers withdrew from NPR, its managing partners were exclusively DGI and Alpha Consultants LLC." *NPR*, 740 F.3d at 1015. Thus, none of the Taxpayers' individual profit motives could even be attributed to NPR because they never controlled NPR's activities. *See Klamath*, 568 F.3d at 550–51. As such, Taxpayers

could not establish that NPR had a profit motive based on the Taxpayers' individual motives. Taxpayers presented no evidence of the motives of DGI and Alpha Consultants LLC.[16]

### 4.      The 2001 and 2002 Assessments Against Mr. Patterson Were Timely.

**[CL136]**    As an initial matter, both Parties used the terms abatement and assessment interchangeably to describe the adjustments made by the IRS to Mr. Patterson's account. To be clear, the crux of the issue is whether such adjustments were mere corrections or were reassessed outside of the statute of limitations. There is no dispute that such adjustments were a mistake. (*See* Tr. II at 154:23–25.) For purposes of clarity, the Court will refer to such as "adjustments."

**[CL137]**    Taxpayers argue that the 2001 and 2002 assessments against Mr. Patterson were untimely because they were "reassessed" after the statute of limitations had expired.

**[CL138]**    IRS Revenue Agent Mr. Sanchez-Garcia credibly testified that the "reassessments" were mistakes made by an unidentified IRS employee who erroneously processed Mr. Patterson's refund claims even though a freeze hold should have prevented such.

**[CL139]**    The IRS employees who processed the refund claims also lacked authorization to do so.

**[CL140]**    As such, the Court concludes that there was no conscious determination made by IRS personnel to execute the abatements. Rather, these abatements were mere processing errors made by the service center.

**[CL141]**    There is no evidence of prejudice to Mr. Patterson because of such errors.

---

[16] Taxpayers make an alternative argument in their Proposed Findings of Fact and Conclusions of Law that was never addressed at trial. Taxpayers argue that if the Court does not allow them to deduct the fees, the fees should be capitalized into the Taxpayers' individual tax basis in the foreign currencies and may be deducted as those foreign currencies were sold. (Dkt. No. 125 at 54–55.) The record is silent regarding this issue. As such, the Court declines to address this argument.

**[CL142]**   Accordingly, Mr. Patterson is not entitled to a refund for those amounts he alleges were "untimely" assessed in 2001 and 2002.

**[CL143]**   Based on the Court's conclusions, the Court need not assess the Government's protective counter-claim under 26 U.S.C. §§ 7401, 7402, and 7405 because the amounts sought were already voluntarily returned by Mr. Patterson or never actually refunded because the mistake was caught before a check was issued.

### 5.    Mr. Roach Is Not Entitled to Claim Losses for the Currency He Disposed of in 2001 and 2002.

**[CL144]**   As an initial matter, the Court notes that this issue was neither raised nor addressed by either party during the bench trial. (*See generally* Tr. I and Tr. II.) As such, the Court is left to rely on the Parties' submissions, including their proposed findings of fact and conclusions of law.

**[CL145]**   In its Notices, the IRS disallowed Mr. Roach's losses in the foreign currency that he sold in 2001 and 2002. The Government does not appear to contest that Mr. Roach is entitled to his cost basis in the currencies, but rather seeks to prevent him from claiming the losses.[17] (*See* Dkt. No. 124 at 22 (Government's Proposed Findings of Fact and Conclusions of Law) ("Roach seeks a refund based on real, albeit small, economic losses that would exist if the foreign currencies distributed to him after withdrawal from NPR were stripped of their artificial basis and included a tax basis only attributable to the fees and expenses he paid DGI and Cohen directly.").)

---

[17] This differs from the situation of Mr. Nix and Mr. Patterson who both reported gains on the sale of their foreign currency. The Government allowed them their full cost basis when computing the gain and they paid tax on that gain. (Dkt. No. 124 at 22.)

**[CL146]**  Taxpayers contend that Mr. Roach should be entitled to a cost basis in the foreign currencies that NPR "passed through" the Law Firm's Form 1065 Partnership Return to Mr. Roach's individual tax return for the 2001 and 2002 tax years.

**[CL147]**  The Government contends that Mr. Roach cannot claim losses from the sale of foreign currency because Section 165(c)(2) prevents this loss deduction. (*See* Dkt. No. 124 at 22 (Government's Proposed Findings of Fact and Conclusions of Law).)

**[CL148]**  The Court concludes that Taxpayers did not establish the requirements under Section 7491 to shift the burden of proof to the Government for this issue. Taxpayers did not produce credible evidence relevant to ascertaining Mr. Roach's tax liability with respect to the foreign currency that he disposed of in 2001 and 2002.

**[CL149]**  Accordingly, Mr. Roach is not entitled to claim losses based on his full cost basis in the foreign currencies.

**[CL150]**  To the extent that Taxpayers contend that Mr. Roach is entitled to deduct such losses under Section 165(c)(2), he is precluded from doing so because the underlying partnership transaction lacked a profit motive. *See supra* Section II.B.3.

## III.  **CONCLUSION**

For the reasons set forth above, the Court concludes that none of the accuracy-related penalties apply because the Taxpayers acted with reasonable cause and in good faith under Section 6664(c)(1); the Taxpayers are entitled to interest suspension for the time periods set forth above because they acted reasonably and in good faith under Section 6404(g); the Taxpayers are not entitled to deduct the fees that they paid directly to Diversified Group, Inc. and Pollans & Cohen under either Section 165(c)(2) or 162(a); the assessments for Mr. Patterson in 2001 and 2002 were timely and any subsequent adjustment to his account was to correct a clerical mistake by the IRS;

and Mr. Roach is not entitled to claim losses for the foreign currency that he disposed of in 2001 and 2002.

The Court further **ORDERS** the Parties to meet and confer and submit, within 45 days, computations of liability (agreed if possible) consistent with these Findings of Fact and Conclusions of Law. The Parties shall also submit a proposed final judgment consistent with the findings herein and the applicable computations of liability.

The Court further **ORDERS** that this ruling will remain **PROVISIONALLY SEALED** until the Parties file joint proposed redactions. Such proposed redactions should include specific explanations for the necessity of such redactions as balanced against the Public's interest in open judicial proceedings. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 592 (1980) ("[O]pen trials are bulwarks of our free and democratic government: public access to court proceedings is one of the numerous 'checks and balances' of our system, because 'contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.'") (*quoting In re Oliver*, 333 U.S. 257, 270 (1948)). The proposed redactions shall be filed on or before 3:00pm (central time) on January 3rd, 2019. Failure to submit timely proposed redactions will result in the complete unsealing of the Order, which, in such case, may not be redacted upon later motion made by the Parties.

**So ORDERED and SIGNED this 20th day of December, 2018.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE